This is a stockholders' derivative suit instituted by the complainants, Arthur and Judith W. Bookman, Ludwig Lavy, and Mary B. Healey — the last named two being intervenors. The Bookmans each own 100 shares of the new class B common stock of defendant R.J. Reynolds Tobacco Company. Lavy owns 45 shares of the same stock, and Mary B. Healey owns 38 shares of such stock. The complainants all reside in the State of New York. The bill was filed November 14th, 1940. Lavy and a Camillo Weiss filed bills of complaint on April 15th, 1941. After the hearing began and an account of the trial appeared in the newspapers, Weiss advised the court that he had never authorized the institution of a suit against the defendants. His counsel was allowed to withdraw Weiss' name as an intervenor. Mary B. Healey first instituted a derivative suit against the same defendants in the United States District Court for the Western District of North Carolina; that suit was dismissed by the court because some of the alleged causes of action involved the internal affairs of a New Jersey corporation — and for the further reason that this suit, which had been previously commenced, *Page 314 
was pending here and awaiting a hearing. Healey v. R.J.Reynolds et al., 48 F. Supp. 207. Mrs. Healey appealed from the decision, and then filed a petition to intervene in this suit. An order was entered here on April 21st, 1943, granting her application. The individual defendants, all non-residents, voluntarily appeared herein. They were the directors of the corporate defendant at the time suit was started.
The hearing of this suit consumed many months; the testimony covers many thousands of pages; the exhibits are voluminous; and the original and several replying briefs are very extensive. The presentation of the briefs ran into the second year after the final hearing.
In the instant case complainants and intervenors hold 283 shares out of a total of 10,000,000 shares outstanding. They are four stockholders of a total of over 60,000. The defendant company has outstanding 1,000,000 shares of common stock, and 9,000,000 of new class B common stock.
The defendant company was incorporated under the General Corporation Act in 1899. Its general offices and factories are in Winston-Salem, North Carolina. For some time, until approximately May, 1911, it was a partly owned, but independently operated, subsidiary of the American Tobacco Company, when that company was dissolved as a trust in restraint of trade under a decision of the United States Supreme Court. United States v. AmericanTobacco Co. et al., 221 U.S. 106; 55 L.Ed. 663. As the American Tobacco Company held two-thirds of the Reynolds common stock, which by the terms of the decree of dissolution was distributed to the stockholders of the American, it followed that control of Reynolds passed by the decree into the hands of the stockholders of the American. R.J. Reynolds, his brother, William N. Reynolds, and directors of their choice had been permitted to manage and operate the Reynolds Company while control was owned by the American, but the evidence shows that they were very unhappy in the association and were determined if possible to wrest control from the American Tobacco Company and its stockholders. In fact R.J. Reynolds expressed delight when the tobacco trust was dissolved.
After the dissolution of the trust the American Tobacco Company and the Liggett Myers Tobacco Company adopted *Page 315 
bonus by-laws. R.J. Reynolds and W.N. Reynolds considered such by-laws, which gave participation in the profits to only a few of the top officials, as being only partly effective. Between them they devised the by-law hereinafter set forth, which would enable any officer or employee to share in the profits of the business provided he remained as an employee and invested all or a part of his estate in the business. It was designed to be both a spur and an incentive.
At a meeting of the board of directors held August 1st, 1912, the by-law was considered and a special meeting of stockholders was called to be held August 23d 1912, to consider and act upon it. Notice was given to all stockholders which contained the terms of the proposed by-law, and that the profits of the company for the year 1910 were 22.19% of its $7,525,000 capital stock and were taken as a basis because the calculations on businesses and brands for 1910, as shown in the plan submitted to the court by the American Tobacco Company and others, were in fact those upon which the dissolution of the tobacco trust was based. They were also advised that "profits for 1910 served as a basis upon which other companies interested in the dissolution have thus far formulated and adopted by-laws providing funds not exceeding 10% of excess profits for distribution among certain of their officers." At the special meeting the by-law XII (formerly XIII) was adopted without objection in the following form:
"All the Company's officers and employees who have owned its stock and been in its employ for not less than twelve months, may be allowed, in the discretion and at the option of the Board of Directors, beginning with the year 1912, to participate, in proportion to the stock thus owned, in the Company's annual profits which are in excess of the percentage of profits earned during the year 1910, to wit: 22.19%, not exceeding, however, 10% of those profits, in excess of 22.19% of its entire outstanding issue of common stock, taking into account pro rata, any increase or decrease thereof made during the year."
On December 22d 1915, at a meeting of the board of directors, the by-law was amended to read as follows:
"All the Company's officers and employees who have owned its common stock and been in its employ for not less than twelve months, then *Page 316 
next preceding, may be allowed, in the discretion and at the option of the Board of Directors, beginning with the year 1912, to participate in proportion to the common stock thus owned, in the Company's annual profits, which are in excess of the percentage of profits earned during the year 1910, to wit: 22.19 per cent, not exceeding, however, ten percent (10%) of those profits in excess of 22.19 per cent of its entire outstanding issue of common stock, taking into account pro rata, any increase or decrease thereof made during the year. The common stock owned by an officer or employee, for the purposes of this By-law, beginning with the year 1916, shall include any stock purchased during the year from an officer or employee or from the personal representative of a deceased officer or employee, provided such stock would have entitled the former owner to participate in proportion thereto, had it been held for the entire twelve months' period."
The bill of complaint charges that this by-law always was and now is invalid; that profits have been distributed under it in excess of the amount permitted by its terms; that there was a misrepresentation to the stockholders of the ratio of earnings to common stock for the year 1910; that excessive participations have been paid through incorrect computation of profits during the years 1912 to 1939, and that the defendant directors by way of participations and fixed salary have received excessive compensation for their services; and, among other things, they ask that the directors be decreed to account to and pay over to the corporation all that had been paid out in participations under this by-law from 1912 to date.
After issue had been joined complainants' accountants were permitted to examine the books of the corporate defendant, and after such examination there was filed an amended bill of complaint in which complainants asserted that the defendant directors had been guilty of breaches of trust in a number of different particulars; that they had wrongfully diverted to their own use funds of the corporate defendant for which they should account; that they had caused the corporation to purchase millions of dollars worth of its own stock for their own uses and purposes for which they should account. The charges will be considered separately, and so far as possible, in order.
It is to be observed that the charges made by the complainants extend from the time of the filing of the bill of *Page 317 
complaint in November, 1940, back to August, 1912. When the complainants first sought to introduce evidence as to these old matters, counsel for the defendants objected on the ground that the complainants had no legal right to inquire into matters before they became stockholders of the defendant corporation. At that time I ruled that the evidence would be received subject to the objection of the defendants and that I would finally rule on the question at the conclusion of the case. It is my decision that the complainants, on the authorities stated at the conclusion of this opinion, cannot go back of the date when the complainant Healey bought her first stock in 1927.
In view of the seriousness of the charges made against the directors of the defendant corporation and the long and exhaustive trial, I shall review the various matters put in issue. I find that no breach of trust has been committed by any of the defendant directors at any time. On the contrary, I find that the defendant corporation has been managed with a high degree of fidelity and exceptional skill, and with profit to the stockholders and benefit to the corporation far beyond the expectation that any stockholder could possibly have had when the by-law was adopted in 1912.
At the time of the dissolution of the American Tobacco trust, R.J. Reynolds Tobacco Company in assets and value of sales was about one-third as large as P. Lorillard Company; less than one-fourth the size of Liggett Myers, and had about one-fifth the sales and one-twelfth the assets of the American Tobacco Company (see United States v. American Tobacco Co.,191 Fed. Rep. 412). At that time the Reynolds Tobacco Company had no business in cigarettes; it had but 2.73% of the smoking tobacco business of the country, 15.49% of the plug tobacco business of the country, no fine cut tobacco business and no business in cigars, snuff or little cigars. Its chief competitors, the American Tobacco Company, Liggett Myers, and the Lorillard Company had 80% of the cigarette business of the country, about 75% of the smoking tobacco business, 65% of the plug tobacco business, and 80% of the fine cut business.
After the adoption of the above by-law on August 23d *Page 318 
1912, the R.J. Reynolds Tobacco Company commenced to grow and expand by leaps and bounds. Its smoking tobacco sales increased by 4,000,000 pounds in 1913 over 1912 and by approximately 4,000,000 pounds in 1914 over the sales in 1913. Chewing tobacco sales in 1913 were over 1,000,000 pounds in excess of those in 1912. In 1913 Reynolds brought out the Camel cigarette. This was known as a burley blend, whereas cigarettes prior thereto had been made chiefly of oriental tobaccos. The company sold over 1,145,000 cigarettes in 1913, over 400,000,000 in 1914, 2,250,000,000 in 1915 and 6,500,000,000 in 1916; its sales of smoking tobacco in 1916 were 33,600,000 pounds as against 18,800,000 in 1912, while its chewing tobacco sales, which were about 36,000,000 pounds in 1912 were over 42,000,000 pounds in 1916.
The rapid expansion of the corporation's business, as above noted, made it necessary in 1917 for the directors to consider the acquisition of new capital. S. Clay Williams, now chairman of the board of directors of the corporation, testified that when he was employed by the corporation as an attorney July 1st, 1917, his first job was to consider ways and means of increasing the company's capital. He said that all possible means were considered and that he was instructed by the directors that under no circumstances should by-law XII be touched or its effect in any way altered, because the management of the company ascribed its remarkable growth from 1912 to that time largely to the incentives and spurs of the by-law.
About this time Mr. Williams saw in the press a report that Bethlehem Steel Company, a New Jersey corporation, had issued a class B common stock, and he thought that solved the Reynolds problem. A draft of an amendment to the company's charter was prepared, considered by the directors and special counsel for the company. It was adopted by the directors, and at a special meeting of the stockholders held after due notice, on November 1st, 1917, the following amendment of the charter was adopted:
"Fourth: The total amount of the authorized capital stock of the corporation is Forty Million Dollars ($40,000,000) divided into Four *Page 319 
Hundred Thousand (400,000) shares of the par value of One Hundred Dollars ($100) each, of which total authorized capital stock One Hundred Thousand (100,000) shares amounting at par to Ten Million Dollars ($10,000,000) shall be Common Stock, One Hundred Thousand (100,000) shares amounting at par to Ten Million Dollars ($10,000,000) shall be Class B Common Stock and Two Hundred Thousand (200,000) shares amounting at par to Twenty Million Dollars ($20,000,000) shall be preferred stock, the total amount of which Preferred Stock, at par, issued and outstanding at any time shall not exceed the par value of the total amount of the Common Stock and Class B Common Stock then issued and outstanding.
"That stock known as Common Stock without further designation shall include and consist only of the common stock now issued and outstanding under the prior status of the certificate of incorporation of the Company.
"That stock to be known as Class B Common Stock shall include and consist only of the Ten Million Dollars ($10,000,000) of such stock authorized under this amendment. The Class B Common Stock shall have the same rights and privileges as the Common Stock of the corporation except that it shall not have any voting power unless and until the corporation shall fail for ninety (90) days to pay the regular common stock dividend thereon, as due, in which event it shall have the same voting power as the common stock of the company as long as such default shall continue and no longer and except further that it shall not be considered under the Company's plan providing for participation by officers and employees in certain profits of the company."
During the year 1918, the class B common stock was issued for a cash consideration of $10,000,000. Each certificate for class B common stock bore on its face the statement that "it shall not be considered under the Company's plan providing for participation by officers and employees in certain profits of the Company."
After the issuance of the class B common stock the business of the company continued to grow and the profits to accumulate. R.J. Reynolds, the founder of the business, died on July 30th, 1918, and the heavy responsibilities that he had theretofore carried devolved upon the junior executives.
At January 1st, 1920, the capital of the company consisted of $10,000,000 of 7% cumulative preferred stock, $10,000,000 of common stock, $10,000,000 of class B common stock, and over $36,000,000 of surplus (called on the financial statements, Undivided Profits). This surplus gave the management grave concern because while the money was needed in *Page 320 
the business there was talk of Congress laying a heavy tax on the undistributed surplus of corporations, and the directors felt that this surplus should be capitalized and retained in the business. The directors accordingly decided that in view of the growth and expansion of the business to recommend to the stockholders changing the class B common stock with limited voting power into a "New Class B" common stock with no voting power, but having all of the other characteristics of the class B common stock that was authorized by the 1917 amendment.
The company in a letter to its stockholders, dated May 1st, 1920, proposed that the par value of all common stock and class B common stock be reduced from $100 to $25 per share; that a 200% stock dividend in the form of New Class B common stock should be paid on all common stock and class B common stock; and that the class B common stock should be exchanged for New Class B common stock, which would differ from the class B common stock only in the reduced par value and the absence of the contingent voting right. The letter requested all holders of class B common stock who were in favor of the proposal to deposit their certificates with the company's transfer agent in exchange for temporary certificates, which would carry a provision under which the company might issue 12 shares of the New Class B common stock in exchange for each share of the class B common stock, provided a sufficient approval of the plan by the holders of class B common stock was indicated, and the common stockholders also approved.
The response of class B common stockholders was so overwhelmingly favorable that the directors, by resolution, submitted the proposal to the holders of the common stock at a special meeting on June 24th, 1920. The proposal was then approved and adopted.
Every share of the class B common stock was exchanged for the New Class B common stock and the 200% stock dividend in the form of New Class B common stock was paid on all the common stock and class B common stock in accordance with the letter of May 1st, 1920, referred to above. *Page 321 
 PREFERRED.
In April, 1913, the corporate charter was amended at a stockholders meeting to authorize 100,000 shares of 7% cumulative preferred stock of the par value of $100, subject to redemption at the option of the corporation on any dividend date after three years from the issue thereof, at $120 per share and any unpaid accrued dividends. $2,500,000 of this preferred stock was sold to the common stockholders in 1915, and the remainder was sold to stockholders in 1917. An additional $10,000,000 of the preferred stock having been authorized in the amendment of 1917, it was sold to stockholders in 1920.
On September 22d 1925, at a directors meeting, a resolution was adopted to exercise the option to redeem the preferred stock on January 1st, 1926, and to call a special meeting of the stockholders to authorize the redemption. A resolution also was adopted authorizing the officers to purchase all of the preferred stock offered between October 1st and December 18th, 1925, at $120 per share, plus the prorated dividend thereon.
On October 20th, 1925, a special meeting of the stockholders authorized the redemption of the preferred stock, and it was all redeemed as of January 1st, 1926. The premium paid on such redemption in the sum of $4,000,000 was charged against the company's surplus.
One of the charges asserted by the complainants is that this $4,000,000 premium should have been charged against the company's profits for the year in which it was paid and that it was not so charged in order to increase improperly the participation fund under the by-law for the benefit of the directors. Not only was this a capital transaction and so treated by the company's auditors and accountants, but in the company's financial statement for the year 1925, dated January 15th, 1926, and mailed to all stockholders of the company, the following appears: *Page 322 
"Net Earnings for the year 1925, after deducting all
 charges and expenses of management, and after
 making provision for interest, taxes (including
 federal and state income taxes), depreciation,
 advertising, etc. ................................. $25,221,579.18
DEDUCT
 Four quarterly dividends of $1.75 each per share
 on Preferred Stock .............................. 1,400,000.00
 ______________
 $23,821,579.18
DEDUCT
 Three quarterly dividends of 75c each and one
 quarterly dividend of $1.00 per share on Common
 Stocks .......................................... 10,400,000.00
 ______________
 Balance carried to Undivided Profits .............. $13,421,579.18
ADD
 Undivided Profits December 31, 1924 ............... 29,732,814.48
 ______________
 $43,154,393.66
DEDUCT
 Premium paid in redeeming outstanding Preferred
 Stock ........................................... 4,000,000.00
 ______________
Total Undivided Profits December 31, 1925 ........... $39,154,393.66"

It thus will be seen that each and every stockholder was advised under date of January 15th, 1926, nearly fifteen years before this suit was brought, and before any of the complainants became a stockholder, that the premium paid to redeem the preferred stock was charged against surplus and not against the profits for the year. On the authorities hereinafter stated I hold that this treatment of this item has been approved by the stockholders by their acquiescence. Moreover, such treatment was in accordance with the provisions of the Federal Internal Revenue Act and the regulations thereunder.
 STOCK DIVIDENDS.
Although the company had paid a 200% stock dividend in 1920 as above stated, net earnings of over $16,000,000 in 1922 and over $20,000,000 in 1923 permitted it to declare *Page 323 
and pay on December 22d 1922, a further stock dividend of 33 1/3% in New Class B common stock of the par value of $20,000,000, and after this dividend the common stock issued and outstanding consisted of $10,000,000 of common stock and $70,000,000 of New Class B common stock.
Earnings of the company for the year 1926 had risen to $26,249,403.10, and the undivided profits at December 31st, 1926, aggregated $50,203,796.76. In 1927 the corporation declared a further stock dividend of 25%, which was paid in the form of New Class B common stock to holders of the common stock and New Class B common stock. The par value of this dividend amounted to $20,000,000. The preferred stock having been retired January 1st, 1926, this stock dividend increased the capital of the company to $100,000,000, divided into $10,000,000 par value of common stock and $90,000,000 par value of New Class B common stock.
Two things are to be observed at this point: First, of this $100,000,000 of capital the stockholders had paid into the corporation only $20,000,000 ($10,000,000 for the common stock, and $10,000,000 for the class B common stock, converted as aforesaid into New Class B common stock); second, that the net earnings of the corporation since 1921 had been in excess each year of the total amount paid into the corporation by the stockholders.
The last change in the capital structure of the defendant corporation occurred December 28th, 1928, when at a special meeting of stockholders the par value of the common stock and New Class B common stock was reduced from $25 to $10 per share and the new certificates of $10 par value stock were exchanged for the $25 par value certificates early in 1929.
The company's annual statement for the year 1929 shows that the net earnings of the company for that year were $32,210,521.27. At that time its capital consisted of $100,000,000, and its surplus was $51,579,859.29. Dividends aggregating $25,500,000 were paid to stockholders in the year 1929, which was 1 1/4 times the total capital the stockholders had contributed to the corporation. In fact, dividends aggregating $26,000,000 in 1927, and $26,000,000 in 1928 were paid on the common stock. *Page 324 
 BY-LAW XII HAVING BEEN ADOPTED BY THE STOCKHOLDERS AND BEING IN SUCCESSFUL OPERATION FOR NEARLY THIRTY YEARS IS VALID.
The charge originally made by complainants that by-law article XII was adopted by a misrepresentation to the stockholders of the ratio of earnings to common stock for the year 1910 was abandoned. Defendants proved that there was no such misrepresentation.
At the time of the adoption of the by-law in 1912 there was no legislative authority for it. Complainants charge that the by-law must be set aside because it authorizes payments to employees based upon no recognized function of employment but solely upon the number of shares of stock held, and they cite in support of their contention Scott v. P. Lorillard Co., 108 N.J. Eq. 153;154 Atl. Rep. 515; affirmed, 109 N.J. Eq. 417;157 Atl. Rep. 388. Complainants also charge that the 1915 amendment to the by-law adopted by the directors but not submitted to a vote of the stockholders is invalid.
Treating the amendment first, I find it valid under the express language of article XIV of the by-laws of the defendant corporation, which provides:
"These by-laws may be altered, amended or repealed by the board of directors by a vote of a majority of all the directors and without the consent or vote of the stockholders."
Moreover, the amendment was for the benefit of the employees as a class and not merely for the benefit of the directors, and cost the other stockholders nothing.
As hereinabove indicated the by-law was adopted at a special meeting of the stockholders on August 23d 1912. At the stockholders meeting no dissenting voice was raised, and the measure was adopted by unanimous vote of the stockholders present after full notice of its provisions. There is a presumption that those who did not appear or vote against the measure assented to the vote of the majority. In re Newark Library, 64 N.J. Law 265;45 Atl. Rep. 622. The by-law has been in operation since its adoption. The company under *Page 325 
it has enjoyed prosperity which is remarkable in its extent. The profit of the defendant company for the year 1912 was $2,899,956.66. For the year 1940 its net profit was $25,548,424.39 after the payment of federal and state taxes on income in the amount of $10,839,723.55.
The number of officers and employees participating in profits for the year 1912 was 27. The number of participants increased almost constantly year by year thereafter, until a high point of 2,177 participants was reached in the year 1928, the number participating in the year 1940 being 2,045. The company now has over 12,000 employees.
During the years 1912 to 1940, inclusive, cash dividends paid on the common and class B common stocks have amounted to over $500,000,000, and stock dividends have been distributed in the amount of $80,000,000.
W.N. Reynolds, formerly president, chairman of the board and chairman of the executive committee of the R.J. Reynolds Tobacco Company, now retired, and who helped his brother, R.J. Reynolds, draw this by-law, and S. Clay Williams, present chairman of the board of directors of the company, both testified that the remarkable growth of the business of the company, and its large profits, have been due to a great extent to the faithful services of the executives and the loyal efforts of the employees, which, they say, have unquestionably been stimulated by the interest which both executives and employees have had in the profits of the corporation.
Mr. Reynolds testified that when the by-law was adopted the Reynolds Company could not afford to pay the high salaries that its competitors were paying, and the bonus plan was devised as the best method of keeping their best men. He said that after employees became stockholders and had their money in the business a great difference in their actions and work was noticeable. He said they took more interest in their work; would not stand for people loafing as they did before; they prevented waste, and he added that in the plant "you could see it work."
Mr. Williams testified that because of the incentives and spurs of the by-law the Reynolds Tobacco Company has become the recognized leader in the tobacco industry; that its *Page 326 
officers and employees all the way down the line have from time to time made suggestions which have reduced costs, eliminated waste, and promoted efficiency. He cited many instances where improvements in methods of buying tobacco, manufacturing, shipping and selling have resulted in large savings to the company, most of which have ultimately been adopted by the company's competitors.
In answer to the contentions of complainants, the defendants assert the right of a New Jersey corporation, independent of express statutory authority, to compensate its executives and employees by paying them a share of the corporate profits, thereby making their compensation contingent in whole or in part upon the success of the business. This right of the corporation they say is clear and has long been established. See Rogers v.Hill, 289 U.S. 582; Bennett v. Millville Improvement Co.,67 N.J. Law 320; 51 Atl. Rep. 706; Booth v. Beattie, 95 N.J. Eq. 776: 123 Atl. Rep. 925; Costello v. Thomas Cusack Co., 96 N.J. Eq. 95; 124 Atl. Rep. 620; Heller v. Boylan, 29 N.Y. Supp.
2d 653.
See, also, Foster v. C.O. Howes Co., 119 N.E. Rep. 356;Sequin v. Plano, 160 Wn. 421; 295 Pac. Rep. 179.
The statute, chapter 175 of the Laws of 1920, as amended bychapter 192 of the Laws of 1932, P.L. p. 321, which, in substance, is re-enacted in R.S. 14:9-1 to 14:9-5, removes any doubt as to the validity of the by-law.
The statute as amended in 1932 provides as follows:
"1. Any stock corporation * * * may * * * carry out a plan * * * for any * * * of the following purposes * * *
"(b) The participation by all or any of its employees and those actively engaged in the conduct of its business in the profits of the corporate enterprise or any branch or division thereof. Theparticipation may be based upon length or nature of service,amount of compensation paid or shares owned, or upon such other basis as may be selected for the purpose and may be in cash or by the delivery of shares of its capital stock held by it, or issued or purchased by it for the purpose. Any such share in the profits shall be regarded as part of the legitimate expenses of the corporation." (Italics mine.)
"4. * * * A resolution or by-law heretofore adopted or approved by a majority vote of the stockholders of a corporation entitled to vote thereon shall be valid from the time of such adoption or approval to the extent it contains terms which might be embodied in a plan or plans authorized by this act, as amended." *Page 327 
The legislature has thus given approval to the by-law in question which plainly comes within the provisions of the 1932 amendment. The by-law, with its amendment, seems to have found no protestant among the company's stockholders until this suit was instituted in November, 1940, and it stood unassailed for a period of more than 28 years. The complainants having purchased their stock after this by-law had been in effect for many years cannot successfully attack it. Epstein v. Schenck,35 N.Y. Supp. 2d 969; Pfister v. Gerwig (S.Ct., Ind., 1890),23 N.E. Rep. 1041.
The case of Scott v. P. Lorillard Co., supra, is distinguishable from this case. In the Lorillard Case the directors proposed an amendment to the by-laws of the corporation, which provided that the treasurer of the company should:
"* * * pay and distribute an amount of such net profits equal in the aggregate to five per cent. (5%) thereof to and among those officers and employees of the company who have both been in the employ and owned common stock of the company as hereinafter stated as an extra dividend upon and in the proportion among such officers and employees of such shares of common stock thus owned by them respectively."
Sixteen stockholders who severally owned 7,413 shares of the common stock of the company joined in a bill to restrain the company from submitting this proposed amendment to its stockholders. The case was decided in April, 1931, prior to the enactment of chapter 192 of the Session Laws of 1932, which specifically authorizes the adoption of a by-law providing for a distribution of profits to officers and employees of a corporation on the basis of shares owned by such officers and employees. The court determined that in the absence of such statutory authority there was no warrant for the payment of an extra dividend on stock owned by officers and employees which was not also payable pro rata to other owners of the same class of stock.
One difference therefore, between the Lorillard Case and the case at bar is that ever since the enactment of the 1932 act, a by-law of the kind under consideration in the instant case has been expressly authorized by statute, while, as above stated, at the time the Lorillard Case was decided no statutory *Page 328 
authority existed for such a by-law. Moreover, in the LorillardCase the court restrained the taking of a vote on a proposal to amend the by-laws, while in this case the attack is upon a by-law which was voted by the stockholders without objection and has been in operation continuously for nearly 30 years without any objection by any stockholder, during which time, as will hereafter appear, officers and employees of the Reynolds Company on the faith of the by-law have invested large sums of money in the common, participating stock of the defendant company, paying from 1 1/4 to 2 1/2 times what the B stocks sold for, thereby acquiring rights which cannot be ignored.
 THE COMPLAINT THAT THE BONUS BASE SHOULD BE ON THE TOTAL OF THE COMMON PLUS TOTAL B STOCKS RATHER THAN THE COMMON STOCK ALONE.
Mr. Williams testified that when in 1917 additional capital was required, it could have been obtained on short term bank loans, long term debentures, by the sale of additional preferred stock or additional common stock. The directors, after he called to their attention the Bethlehem Steel Company's class B common stock, decided to raise the additional capital through the issuance of a class of stock having the general characteristics of common stock but having such additional qualifications and characteristics as not to change the application or results of the by-law which would follow an increase in the amount of stock on which participations should be payable, or by enlarging the capital base on which 22.19% would have to be earned before participations could be paid. This was five years after the stockholders had adopted by-law XII and its worth to the company and the stockholders had been proved. Undoubtedly many of the stockholders who had approved the by-law in 1912 voted on the 1917 amendment of the charter.
Subsequent events have shown that the management contemplated a wide distribution of the participating stock among the employees. The participation base would not have been widened by raising new capital through bank loans, *Page 329 
debentures or preferred stock. There was submitted by management to the stockholders an amendment to the certificate of incorporation which expressly stated the differences between the common stock and the class B common stock. This amendment said:
"That stock known as Common Stock without further designation shall include and consist only of the Common Stock now issued and outstanding under the prior status of the Certificate of Incorporation of the Company.
"That stock to be known as Class B Common Stock shall consist only of the Ten Million Dollars ($10,000,000) of such stock authorized under this amendment. The Class B Common Stock shall have the same rights and privileges as the Common Stock of the corporation, except that it shall not have any voting power unless and until the corporation shall fail for ninety (90) days to pay the regular common stock dividend thereon, as due, in which event it shall have the same voting power as the Common Stock of the Company, as long as such default shall continue and no longer, and except further that it shall not be considered under the Company's plan providing for participation by officers and employees in certain profits of the Company."
The adoption by the stockholders of this amendment in 1917 was nothing less than a definition or description by the stockholders of this company of its several classes of stock. This amendment was adopted by a vote of over 91% of the common stock then issued and outstanding.
All of the certificates for the class B common stock; all of the warrants for exchange of the class B common stock into New Class B common stock in 1920; all the certificates of New Class B common stock; and all of the shares of common stock issued after the B stocks were authorized have had printed on the face thereof the statement that the Class B common stock and the New Class B common stock respectively "shall not be considered under the Company's plan providing for participation by officers and employees in certain profits of the Company."
The certificates of stock of the complainants and intervenors were marked as exhibits and this phrase appears on the face of their certificates.
This phrase has been carried forward into each of the amendments of the company's charter. The 1920 amendment *Page 330 
referred to the common stock as "Ten Million Dollars ($10,000,000) of Common Stock (to be known as `Common Stock' without further designation)" and defined and described the New Class B common stock as in the 1917 amendment.
Counsel for the defendants in their brief state that the complainants have failed to show how the profits distributable under the by-law can be determined in accordance with their claim without considering either the Class B stock or the New Class B stock. This argument is unanswerable. The very essence of complainants' contention is that no distribution could be lawfully made under the by-law without considering the Class B and New Class B stock, whereas the amendments which created this stock both expressly provided that the stock should not be so considered.
Ever since 1918 the directors, many of whom are now dead, have construed common stock as used in the by-law to mean the class of common stock that was authorized by the charter in 1912, when the by-law was adopted. They have construed the class B common stock and the New Class B common stock to be a new class of stock. Such a class is permitted by section 18 of the Corporation Act, as amended in 1901, which reads as follows:
"Every corporation organized under this act shall have power to create two or more kinds of stock, of such classes, with such designations, preferences and voting powers or restrictions or qualifications thereof as shall be stated and expressed in the certificate of incorporation or in any certificate of amendment thereof, * * *."
This act was in effect when the amendment of 1917 was adopted.
I find that the action of the directors, and their construction of the by-laws and the charter of the defendant company was correct, and that they were justified in not considering the class B common stock and New Class B common stock when annually they considered the question of participations.
The answer to the criticism of the complainants that the board of directors did not give full and complete information to the stockholders regarding the amount of participations paid in each year and to whom such participations were paid *Page 331 
seems to me to be that this was a function of management. Some corporations give their stockholders very full information about every phase of the business; other corporations do not. The stockholders have a right to call on the officers for any information they may wish. The failure to give such information as that referred to does not constitute either fraud or breach of trust.
 THE W.N. REYNOLDS SPECIAL ACCOUNTS.
The accountants for the complainants who examined the books of the R.J. Reynolds Tobacco Company after issue on the original bill was joined, testified that they discovered between 1920 and 1933, inclusive, the defendant maintained a number of accounts bearing the name "W.N. Reynolds." W.N. Reynolds, as above stated, had gone into the business with his brother R.J. Reynolds long before it was incorporated, and in 1920 he was president of the company.
The accountants discovered some ten or fifteen of these special accounts, and because each bore the name of one of the defendant directors who had been the company president they scrutinized with care all the entries in all these accounts. They discovered that on or about January 18th, 1923, the company purchased 4,000 shares of its Class B common stock for $191,912.50 and another block of 1,000 of such shares for $49,000. These amounts were charged to the special account. The account showed that between January and April, 1923, these 5,000 shares of B stock were all sold on the Stock Exchange at a profit, the profit on the 4,000 shares being $48,557.87 and the profit on the 1,000 shares being $9,597.94, and that the company issued checks for these amounts to the defendant, W.N. Reynolds, a director, personally.
The accountants also discovered and testified to payments made to New York brokers for stock in the company that had been purchased in the name of an account entitled "James A. Gray Employees' Account," and to other brokers in payment for common stock bought in a personal account of S. Clay Williams when he was president. *Page 332 
It is unnecessary here to detail all of the very numerous transactions that were covered by the testimony of complainants' accountants on the one hand and that were explained in great detail, item by item, by Mr. Reynolds, Mr. Williams and Mr. Gray. Suffice it to say by way of preface that although many of these transactions went back as long as 20 years, and although many of the corporation's records supporting the books were destroyed years before this suit was brought under a standing company instruction to destroy records after a certain number of years, the defendants produced before me evidence so clear and convincing of the bona fides of every transaction that I hold that there was no fraud or breach of trust whatsoever.
A very large part of the time devoted to the trial and to the briefs concerned these special accounts because they were in the name of the company's president and a director. The facts that were developed are not in dispute. The complainants seek by the inferences they draw from undisputed facts and by serious charges of fraud, bad faith, self-dealing and by misleading terms to fasten liability upon the directors, which I find to be not justified in any respect. On all the evidence I find not a single instance of fraud or breach of trust on the part of any director.
When by-law XII was adopted, 27 officers and employees owned 19,140 shares of the company's common stock. Over 66,000 shares having been in the hands of American Tobacco stockholders, principally its officers and directors who controlled the tobacco trust, by 1920 the number of officer and employee participants was only 161, and they held 100,196 shares of the $25 par stock.
It is alleged that R.J. Reynolds in his lifetime personally helped a number of employees to buy stock and financed their purchases. In the period between 1912 and 1920 the company itself purchased some shares of its common stock and allotted these shares to employees, who paid for them part cash and the balance by a note secured by the stock. All of such notes bore interest at the market rate. In fact, on October 5th, 1912, six weeks after the by-law was adopted, the board of directors passed a resolution authorizing the treasurer to make *Page 333 
loans to employees but not exceeding the book value of the stock given a security. This was perhaps the origin of the attempt to get the company's voting stock away from the stockholders of the American Tobacco Company.
It appears that after the death of R.J. Reynolds there was no one in the company who had the financial ability personally to finance the purchase of the company's common stock for employees. When the large stockholders who had received their stock through the American Tobacco Company were approached and asked to sell their stock, they declined to do so because they wanted to retain their investment in the company and did not want to pay income taxes on the difference between the cost of the stock to them and its then market value, which was very high. A change in the income tax law permitted a tax free exchange of one class of stock for another class of stock in the same corporation. This statute afforded an opportunity for the company or an employee to purchase the Class B common stock and later the New Class B common stock and exchange it for the common stock which participated under the by-law.
Since very large blocks of the Reynolds common stock were held by a number of different persons, many of whom had been directors of the tobacco trust, the directors decided that the only way the purposes of the by-law could completely be served and the common stock secured from the American Tobacco Company group for distribution to a large number of employees, was for the company itself to acquire the common stock and distribute it to employees. The company, accordingly, in 1920, commenced the purchase of common stock for sale to employees and the purchase of New Class B common stock to be used for exchange for common stock, which common stock would then be sold to employees.
In the first few years its practice was to make distributions to the employees as soon as possible after the stock was acquired. Because there was a delay between the time the money was laid out for the common stock purchased or the B stock purchased for exchange and the date when the common stock was sold to employees, the company made a practice of charging interest at bank rates on all moneys laid out to *Page 334 
acquire such stock. Employees were required to pay part of the purchase price in cash but were permitted to give the company their notes, secured by the stock but not in excess of its book value.
This interest was paid to the company as part of the cost of the employee's stock. The defendants say that interest was charged to these special accounts in order that no employee would have the use of the company's money for his benefit without paying for it, and in order that the stock might be resold at a price which would include every item of expense to the company, less dividends, the price being fixed as though the employee had bought the stock at the time the company bought it but had not paid for it until it was allocated to him; that when the stock was sold the interest was collected, and was a receipt of the company. Being considered an item of earning, such interest was included in the company's profits in every year. The total of employees' notes was carried on the company's books and its annual statements in "Other Accounts Receivable." In the first few years after 1920, such amounts were true receivables because the company held the employees' notes secured by the stock not wholly paid for.
Complainants charge that this interest was improperly credited to the earnings account because the employee was given credit for any intervening dividends, but I feel that the officers were justified in treating the interest as earnings on the company's money invested, and having been collected from the employees the stockholders were entitled to have it treated as income, particularly since the whole idea of the management was to distribute the stock to the employees just as though they had acquired it the moment the company acquired it.
Complainants' accountants discovered in their analysis of the W.N. Reynolds Special Accounts on defendant's books, several transfers of blocks of B shares from one special account to another. Every one of these transfers was explained to my complete satisfaction.
One transfer was of 2,526 shares of B stock from the company's investment account to a W.N. Reynolds Special Account on August 20th, 1924. It was recorded as sold at *Page 335 
approximately $68.50 per share, and complainants say the market price that day was $77 per share, as a result of which they claim the selling price was approximately $24,000 less than the market price.
Mr. Gray, who handled the transaction, explained that early in June, 1924, the company decided to sell some of its investment stock. At the same time the company was engaged in acquiring B stock to exchange for common stock for resale to employees. To avoid paying a broker's commission for selling the investment stock and then paying another brokerage commission to buy a like number of shares, the stock was simply transferred from the investment account to the special account at the market at the time the matter was arranged. The B stock placed in the special account was exchanged for common stock. Mr. Gray testified that the market at the time the transaction was arranged was the price at which the stock was entered in the account.
All the facts and circumstances support Mr. Gray's explanation of this transaction. The common stock that was received for these 2,526 B shares was transferred between November 5th and November 29th, 1924, to 248 employees.
Complainants criticize a purchase of 700 B shares on May 3d 1928, at $91,000; the recording of that purchase in an investment account and the subsequent transfer of those shares two weeks later to Account No. 2 at $92,487.50, an increase of $1,487.50.
Mr. Gray explained that the 700 B shares were purchased originally as an investment in the company's own stock. They were transferred to the No. 2 Account to exchange for common stock at the then market, which, in the meantime, had advanced about $2 per share. He explained that the transfer was made to avoid selling the 700 B shares on the market from the investment account and buying the same number of shares for the employees' stock purchase account and paying brokerage commissions both ways. The common stock received for these 700 B shares in exchange was practically all disposed of before the end of 1928 to employees.
While, as above stated, the W.N. Reynolds special accounts were primarily used for the purposes above mentioned, the *Page 336 
defendants say they were also used for other proper corporate purposes.
The accounts were kept under the direction of Mr. James A. Gray. Mr. Gray, prior to coming with the company on January 1st, 1920, had been a banker. He had been president of the North Carolina Bankers Association, and had been a state senator. He used the special accounts not only for the purposes above mentioned, but in some instances he segregated in a special account a particular block of stock bought for investment, or a particular block of stock for trade, and even used a W.N. Reynolds Special Account to record the purchase of a site for the company's office building in Winston-Salem. The money for this purchase was paid over to real estate brokers and the amount set up in a W.N. Reynolds special account. After the site was acquired in the name of the company, the special account was closed.
Another like transaction occurred in 1927, when the company desired to purchase a tobacco foil manufacturing company located at that time in Richmond, Virginia. The tobacco company made a contract with the three individuals who owned the stock of the foil company to purchase the stock, and to erect for the company a foil plant in Winston-Salem, and operate it for the company. The purchase price was paid in installments, at intervals, pending the completion and operation of the plant. As the payments were made, they were charged to one of the Reynolds special accounts, and carried in the financial statement as "Other Accounts Receivable." This transaction did not represent a true receivable, but represented the amount paid by the company for the stock of the tobacco foil company. These operations, it is alleged, caused no loss to the company, and it seems were a convenient method of keeping account of the money in use until the transaction was completed and then transferred to its proper permanent account.
The checks to W.N. Reynolds referred to at the beginning of this heading relating to the special accounts were fully and convincingly explained by Mr. W.N. Reynolds, Mr. Williams and Mr. Gray. The transaction occurred in 1923 when the company was offering two shares of New Class B common *Page 337 
stock for one share of common stock. Craig, Kent and Fleshman, who together owned 5,600 shares of the common stock, refused to trade on the two-for-one basis. Mr. Williams testified that Mr. Reynolds, "who is quite a horse trader," called on Craig, Kent and Fleshman to try to induce them to go along with the management and trade their stock, and in the course of his negotiations he said that if they would trade their stock on the two-for-one basis he would buy them 5,000 shares of B stock and hold it for as long as a year, giving them the privilege of ordering it sold at any time; would only charge them interest on the cost of the stock, would give them any profit if the shares were sold and he personally would stand the loss if the stock went down. Reynolds' proposition was accepted.
The 5,600 shares of their common stock were distributed with 8,552 other shares to 612 employees, none of whom was a director. When the stock went up Craig, Kent and Fleshman asked Mr. Reynolds to sell it. The company sold the stock and gave Mr. Reynolds its checks for the profit less interest on the company's money that had been invested in the meantime in the B stock. Mr. Reynolds deposited the company's checks in his personal account. He thereupon immediately drew and delivered his own checks to Kent, Craig and Fleshman for their respective shares of the profit, not letting them know that the company had bought the stock. Mr. Reynolds, however, had guaranteed the company personally against any loss. The testimony of the defendants was supported by the documents and bank records.
Since no director gained by this transaction and the company sustained no loss, but on the contrary received interest on the money for the short time it was outstanding, there is no liability on the part of the defendants in this connection. Furthermore, it is another of the transactions that occurred long before any of the complainants became a stockholder.
As to the charge that payments were made to New York brokers for stock purchased in the accounts of Mr. Gray and Mr. Williams as above mentioned, the evidence discloses that every purchase of company stock through these accounts was carefully segregated by these gentlemen from any business of *Page 338 
their own, payment for the particular stock was made to the broker and the stock purchased was delivered immediately to the company and put in the name of the company's nominee.
Complainants criticize the purchase by the company of 45,000 shares of New Class B common stock early in 1929 to trade for Mr. Lasater's 36,000 shares of common stock.
Mr. Williams testified that Mr. Lasater had been with the company 54 years and was in charge of the manufacturing department of the company. Early in 1929 Lasater was very ill. Following his recovery he stated to Bowman Gray, president of the company, that he had in mind to retire at the end of 1929, and wanted the company to place his shares of common stock with the employees. An exchange was arranged with him on the basis of 1 1/4 shares of B stock for his common stock. The company bought 45,000 shares of B stock in the market to exchange for Mr. Lasater's 36,000 shares of common stock and charged the cost to Reynolds Special Account No. 2.
In the fall of 1929 Mr. Lasater's principal assistant died and he then announced his decision to remain with the company. The 45,000 shares of B stock which had been purchased by the company for the Lasater exchange were then transferred from the No. 2 account to an investment account known as Reynolds Special No. 2B. These 45,000 shares so transferred to the investment account were part of the shares which were sold in the years 1930 to 1933, inclusive, which produced a profit for the stockholders in excess of $5,000,000, as hereafter mentioned.
The defendant Gray in explaining the reason for the company purchasing on the market 45,000 shares of New Class B common stock specifically to make the exchange with Lasater when it had more than that number of shares in the investment account (that were part of a block of stock purchased years before from the United Retail Cigar Stores purchase), testified that the shares of United stock stood on the books of the company at about $8 per share, and that to have used 45,000 shares of this low cost stock for the exchange with Lasater would have made the common stock acquired by the company from him stand on its books at about $10 per share; *Page 339 
and "it would have been manifestly unfair to the stockholders of the company for us to have sold the United stock to the employees where only $8 a share was being realized from the B stock; whereas, we could have sold it, and did sell it, at the market and otherwise in later years and realized a handsome profit for the general stockholders on that United stock."
I think the defendants' explanation of the purchase of the 45,000 shares of the New Class B common stock to trade for the Lasater stock, bears the impress of truth, and I do not find, in the circumstance, room for censure.
Answering complainants' counsel's reference to the transfer on December 31st, 1929, of 10,400 shares of New Class B common stock from W.N. Reynolds Special Account No. 7E, which was then used as an investment account, to W.N. Reynolds Special Account No. 2, the defendants say it was made at cost. During the following year 1,400 shares out of the 10,400 shares of B stock were used for exchange purposes, and during this same year the balance of 9,000 shares were retransferred to the investment account at the same price per share at which they had been transferred from the investment account the year before to the special account. These transfers were of company owned stock from one account to another. The common stock which was received in exchange for the 1,400 shares of B stock was not sold by the company but ultimately went into the Insurance and Retirement Fund. The company neither gained nor lost anything by either of these transfers.
The defendants take the position that it was proper to use the special accounts to keep stock for employees separate from stock bought for investment, and that the number of employee stockholders was greatly increased by the company's purchases and resale of common stock.
I believe the officers and directors defendants, in the opening and operation of the special accounts, acted in entire good faith; and I believe their conduct in the circumstances was free of any improper and wrongful intent.
By 1933 the special accounts apparently had served their purpose and they were all closed out without loss to the company, but to its great advantage. *Page 340 
Control of the company had been removed from the stockholders of its principal competitor; the officers and employees of the corporation owned 651,703 shares of its voting stock, and from the participation fund of approximately 10% of the annual profits they were paying for 200,000 shares of common stock in the Insurance and Retirement Investment Fund which is relieving the other stockholders of contributing anything for employee retirement, health and insurance benefits, as will hereafter appear.
 THE ALLEGED PAYMENT OF PARTICIPATIONS TO PERSONS NOT ENTITLED THERETO UNDER THE BY-LAW.
Complainants also charge that participation payments were made under the by-law XII to persons not entitled thereto. The by-law as originally adopted provided that officers and employees of the company participate in the company's annual profits only if they "owned its common stock and had been in its employ for not less than twelve months, then next preceding." The by-law as amended in the year 1915 provided that the ownership prerequisite would be satisfied if the stock was purchased during the year from an officer or employee, or from the personal representative of a deceased officer or employee, provided the former owner would have been entitled to participate had he held the stock for the entire twelve months' period.
They charge that after the adoption of the by-law the directors and officers improperly adopted a practice of having the company allocate and sell its common shares to officers and employees and allowing the purchasers to participate thereon under by-law XII at the end of the year during which they purchased the shares, even though such stock was not acquired from an employee.
The defendants insist that the corporation was not injured by the decision of the officers that employees allotted stock after the year end, acquired by the company for them before January 1st, might participate for the year. They say that *Page 341 
this plan helped to secure a wide distribution of the common stock of the company among its employees and it speeded up placing them under the incentive of the by-law and spurred their interest in the company. Mr. James A. Gray, president of the company, testified:
"When we first started in 1920 (to accumulate stock) my recollection is that we made distributions during the year. That is to say, if we acquired some stock in July, 1920, we would try to allocate that and complete the sale of it by, say, September or October. That was true in a number of other instances throughout the years, that if we acquired a block early enough in the year a good-sized block, we would distribute it promptly.
"On the other hand, a great deal of the purchasing throughout the years was done late in the year. It was the natural thing for a stockholder considering selling his stock to delay the sale as long as he could, hoping the market was going up, and we found that a great many of those people would not give us their decisions. Many of this old American Tobacco Company group and other old stockholders would not give us their decisions until late in the year; and therefore when we purchased such a large part of the stock right up to the last minute on December 31st, we found it was impractical to make an intelligent allocation day by day at the end of the year as we were securing it for two reasons. First, as explained yesterday afternoon, we did not know the total number of shares that we would have to allocate, intelligently allocate, against the orders in hand; second, the price that we were paying for each lot, even if it was a half a dollar a share difference for a hundred shares or 500 shares as contrasted to a purchase the day before of a larger amount at a lower price — each fraction on each individual purchase changed the average for the entire block, and in order to let all employees purchase at the same price it was necessary to wait until the entire accumulations would come in at the end of the year and then get an average on the entire amount and allocate it promptly after January 1st."
This allocation, Mr. Gray said, at cost plus interest and less dividends, gave the employees the stock at the price "just *Page 342 
as if he had owned it from the day the company first bought it."
The defendants state that the distribution of the stock to the employees who had ordered it was delayed for the convenience of the company in order that it might make a fair allocation of the stock at the same price to each employee; and it construed the by-law as permitting the employees who, because of the necessary delay on the part of the company in distributing this stock, had not actually received it until shortly after the commencement of the year, to participate for that year as equitable owners of the stock. This plan appears to have been followed throughout the years as to all employees.
Likewise, the company consistently carried into its "Other Accounts Receivable" account not only the amount owing on employee notes but also the total amount invested in the special account which carried the common stock not yet distributed to employees, and paid for. The reason given for this was that until 1928 or 1929 the stock had been paid for by the time the annual statement was mailed to stockholders and it was then a true receivable. In the meantime, it was a potential receivable. No stockholder was harmed by this treatment and it was approved by Ernst Ernst, the company's disinterested accountants.
The complainants contend improper payments of participations were made to officers and employees who were not record owners for the full twelve months, and condemn the alleged practice of the company in considering an employee an owner of common stock within the meaning of the by-law from the date when he made a firm contract for its purchase.
The defendants argue that an employee who had entered into a binding contract to buy stock had the same incentive as though he had become the record owner; that if he had the beneficial ownership in stock he had the same incentive as though he had legal title thereto, and a much greater incentive than if he had the legal title with no beneficial interest. They contend that for many purposes, a person who has a binding contract to purchase stock is regarded as the owner of such stock. I fully agree with the defendants' contention — a person having an equitable interest under our *Page 343 
legal system is entitled to such benefits as that interest demands. The decisions of our courts are to that effect and the following cases sustain it.
In Masholie v. River Edge Estates, Inc., 129 N.J. Eq. 228;19 Atl. Rep. 2d 27, this court said:
"It is my opinion that the judgment, or decree, obtained by the complainant (Exhibit C-2), directing the specific performance of the agreement concerning the ownership of the stock between the complainant and Daniel J. Salvatore, places the equitable title of the stock in the complainant from June, 1935, when the contract was made, notwithstanding the fact that the judgment, or decree, awarding the title to the stock to this complainant was entered approximately five years later."
In O'Connor v. International Silver Co., 68 N.J. Eq. 67;59 Atl. Rep. 321; affirmed, 68 N.J. Eq. 680; 62 Atl. Rep. 408,
Vice-Chancellor Pitney, in sustaining the right of the complainant to sue as a stockholder, notwithstanding the fact that he was not a stockholder of record, said in part:
"The status of the holder by legal assignment of a certificate of stock which has not been transferred on the books of the company is in some respects better than that of a real estate owner whose deed is unrecorded, because, in the absence of actual notice, the grantor of such a deed may make a good title to a purchaser in good faith for value."
And also,
"I am unable to perceive why a clear title to the shares of stock, with the immediate right to have the stock transferred on the books of the company, does not give the owner a right to the ear of this court to protect his interest in the corporation and its management."
In Cook v. Sterling Electric Co., 118 Fed. Rep. 45, the court said:
"It is claimed that, whatever may be the equitable rights of the defendants under the agreement, the legal title is in the complainant, and that the oral agreement cannot be set up as a defense, and that the defendants should file a bill setting up their equitable rights, and compel a transfer of the legal title. It suffices to say that this contention overlooks *Page 344 
the fact that this is a suit in a court of equity, where, inmatters within its jurisdiction, an equitable title is as good asa legal title as to all parties affected by such equity. It cannot be maintained in a court of equity that a party holding the equitable title will be denied his equitable rights by the holder of the naked legal title. In such a case the holder of the legal title stands, in a court of equity, as a mere trustee for the use and benefit of the owner of the equitable title or estate. It certainly would be against conscience to permit a complainant, while holding the consideration for the oral agreement of sale, to pursue the defendants as wrongdoers." (Italics mine.)
In Cushing v. Blake, 30 N.J. Eq. 689, Mr. Justice Depue, speaking for the Court of Errors and Appeals, said: "The doctrine of courts of equity is that equitable estates are considered, to all intents and purposes, as legal estates."
Complainants further charge that only officers and directors were given the advantage of participating on stock equitably owned before the year end but transferred to them of record after the first of the year. Mr. Gray completely answered this contention as follows:
"In all instances, employees were regarded as holders of common stock from the date that such employees made a contract to purchase the stock, without regard to the date when the stock was actually transferred into the names of such employees on the transfer records of the company. Also, where the company, pursuant to its general practice, purchased stock during any year for distribution to employees and distributed the stock to such employees shortly after the beginning of the following year, such employees were regarded as owning the stock from the beginning of such year.
"Q. Now, can you give instances of the application of that interpretation of the by-law as applied to employees of the company? A. I produce a list showing for the period from June 4th, 1920, to April 23d 1925, every distribution of stock of any consequence with the exception of the Duke distribution, which has already been put in the record, of stock to employees under the program that I have just outlined; and I call attention to the fact that the first several *Page 345 
distributions listed on the front page of this proposed exhibit are distinctly described as non-participating for that year, meaning that the stock was bought, in this first transaction, prior to June 14th, 1920, from four brokerage concerns. Therefore that stock was not entitled to participation for that year, because it had not been held during the entire year by an employee. Therefore the first distribution of 1,299 shares are described as non-participating for 1920. The same description applies to the next three lots. The next distribution on the front sheet, transferred on October 14th, 1920 — * * * Was to four employees of the company of a total of 1,508 shares, which shares were allowed to participate for the year 1920 because they were transferred from the name of Joseph M. Babcock, a nominee of the company, and had been owned prior to January 1st, 1920. I do not think it necessary to go any further in describing this proposed exhibit as each page describes on its face the lots that were participating for respective years and the lots that were non-participating for the respective years."
It appears that transfers of 28,464 shares of stock acquired from the Duke interests were made to 1,214 employees, all of whom participated on the stock for the year 1926, although the stock was not in their names of record at the beginning of the year. Among those employees there were three directors to whom 2,289 shares were transferred. They having an interest considered to be equitable, as above expressed, were entitled to the benefits accruing as hereinabove observed.
Complainants assert that S. Clay Williams, now chairman of the defendant's board of directors, was improperly permitted to participate for the year 1926 on 13,000 shares of common stock that were acquired for the company by Mr. W.N. Reynolds from Thomas Fortune Ryan, one of the former directors of the American Tobacco trust. The facts of this transaction appear to be as follows:
A number of unsuccessful attempts had been made to acquire Mr. Ryan's stock. In 1925 the company had acquired a large block of stock from the Estate of J.B. Duke and others associated with Mr. Duke in the American Tobacco trust. The allocation of that stock was made by W.N. Reynolds, *Page 346 
chairman of the board, Bowman Gray, then president, and James A. Gray, vice-president in charge of the company's finances. None of this stock had been allotted to Mr. Williams, who was rising in importance in the company.
In December Mr. Reynolds telegraphed Mr. Ryan at his home in Virginia asking if he would grant Mr. Williams an interview, and he sent Mr. Williams to see Mr. Ryan and try to negotiate a trade of B stock for common stock. After an all-day conference, Mr. Williams negotiated an agreement in which Mr. Ryan agreed to exchange his 14,900 shares of Reynolds common stock for 19,021 shares of New Class B stock, upon Mr. Reynold's personal guaranty against Ryan having to pay any income tax on the exchange. Upon his return to Winston-Salem and reporting the trade, Mr. Williams was advised by his superiors that he could have all or any part of the Ryan stock. He elected to take 13,000 shares and the remainder were taken by five other employees, no one of whom was a director. Williams owned sufficient B stock to exchange for his 13,000 shares of the Ryan stock, but part of it was in his safe deposit box, part was pledged to banks and the remainder to brokers, not all paid for. On December 30th or 31st, Williams advised the company's agent in charge of the participation records that he had acquired 13,000 of the Ryan stock.
I find that the transaction with Mr. Ryan was fully arranged before December 31st, as evidenced by letters and telegrams which are in evidence. The exchange of certificates with Mr. Ryan was made in New York on February 10th, 1926, to suit Ryan's convenience, who insisted that the New Class B certificates be registered in his name before he would deliver over his certificates for the common stock. As a matter of convenience Mr. Williams and the others to whom were allotted the Ryan stock, delivered their certificates for B stock to Mr. James A. Gray, excepting such certificates as Williams had pledged to banks and brokers. Williams arranged that the banks and brokers would deliver the B certificates which they held in exchange for common certificates, and the proper authorizations and agreements were delivered to Mr. Gray to put the transaction through. *Page 347 
Mr. Gray, to facilitate putting the exchange through with Mr. Ryan, after being fully secured as above mentioned by the B shares, agreements and documents from Williams and the others who were to get the Ryan shares, ordered the company's transfer agent to transfer into the name of Thomas F. Ryan 19,021 B shares owned by the company and registered in the name of its nominee. These were delivered to Mr. Ryan against the receipt from him of the 14,900 shares of common stock. These 14,900 shares of common stock were distributed to Williams and the other employees and to Williams' bankers and brokers, and the B shares that stood in the nominee's name were replaced by the B shares that came from Williams and the other employees.
Complainants charge that this was an improper transaction in that Williams had use of company funds and property and that the company ran the risk of a large loss should Williams die or should a creditor have attached his interest in the Ryan stock.
The evidence indicates that the transaction involved no use of the funds of the company and no speculation by Williams: nothing belonging to the company appears to have been placed under the control of Williams; and no obligation was incurred by the company except the obligation to deal faithfully with securities belonging to Williams which at all times were under the control of the company until the entire transaction had been completed.
Complainants further charge Williams was improperly allowed to participate on these 13,000 shares of Ryan stock for the year 1926. He was allowed to participate on it just as every other employee was permitted to participate on stock equitably acquired in 1925. Moreover, the decision to allow him to participate in the fund was made by the other directors, whose share in the participation fund was reduced materially by allowing the 13,000 Williams' shares to participate. It would have been to their selfish interest to deny Williams the right to participate in 1926 on these shares. Their decision cost the non-participating stockholders nothing whatsoever. I can find nothing improper in the actions of Mr. Williams or any other director in this connection. Incidentally, *Page 348 
the complainants do not charge that the company improperly paid participation to the half dozen other employees who acquired 1,000 shares of the Ryan stock.
Complainants also charge that Mr. Williams improperly was allowed to participate on 500 shares for the year 1924 that were transferred to his name of record January 5th, 1924. Mr. Williams proved to my entire satisfaction that he became the equitable owner of this stock in 1923, having arranged to buy it from the R.J. Reynolds Memorial Auditorium Commission. He built up his bank balance December 31st, 1923, to pay for the stock pursuant to his agreement to purchase, and on January 1st, 1924, issued his check for the price. He did not know until the Commission made delivery that the certificate was registered in the name of Kathryn S. Johnston and had been endorsed by her over to the Commission.
I find that Mr. Williams acquired the equitable title to this stock in December, 1923, and it was not improper for the directors to permit him to participate on such stock for the year 1924. Moreover, these are some of the transactions occurring long before the complainants became stockholders of the defendant corporation and of which they have no right to complain.
The complainants contend that the payments to Gordon Gray under the by-law were improper. They contend he was not an employee of the company and notwithstanding, was permitted to participate under the by-law for the years 1936 to 1941 inclusive by reason of his inheritance of 2.005 shares of Class A stock.
The defendants challenge the correctness of the complainants' assertion that Gordon Gray inherited a single share of common stock from his father, Bowman Gray, former president of the company. Gordon Gray is a lawyer, and was a member of the law firm of Manly, Hendren Wemble, which firm for many years has been local counsel for the defendant corporation, and participated as a partner in the retainer paid by the company. Because of the character of the work he did for the R.J. Reynolds Tobacco Company, and because he was a stockholder, Mr. Williams, chairman of the board, *Page 349 
suggested to the board of directors that he be added to the list of those entitled to participation under the by-law.
As early as 1917 the company decided with respect to its attorneys "who were under continuous employment by the company — that is, on fixed annual retainer, or monthly retainer — and we ruled that under the by-law an attorney for the company attached to it in its employ by the year was entitled to participate." Mr. Williams testified that: "there were certain lines of work that Mr. Gray performed for the company. There were certain other lines of work that another member of the firm [Manly, Hendren 
Wemble] performed for the company."
It appears that Gordon Gray left the above law firm and became a publisher; Mr. Williams said, "We made an arrangement with him under which he was paid a retainer to keep an eye out for certain public relations questions of R.J. Reynolds Tobacco Company" on which he worked with Mr. Williams from time to time.
The defendants contend that it was a matter of business administration for the directors to decide whether or not these gentlemen, including Gordon Gray, were employees of the company within the meaning of the by-law. They knew better than anyone else whether it was to the advantage of the company and its stockholders to consider these attorneys as employees of the company and allow them to participate on their common stock and thus tie them in more closely than otherwise might have been possible with the interest of the company and its welfare. The testimony indicates that Gordon Gray was a company employee within the meaning of the by-law.
See Turner v. American Metal Co.,50 N.Y. Supp. 2d 800, which said of the power of the board of directors:
"They were the exclusive executive representatives of the corporation and were charged with the administration of its internal affairs and the management and use of its assets. Their corporate acts were within the power of the corporation and the lawful and legitimate furtherance of its purposes in good faith and the exercise of an honest judgment are valid and conclude the corporation and the stockholders. Questions *Page 350 
of policy, of management, expediency, of contract or actions, adequacy of consideration, lawful appropriation of corporate funds to advance corporate interests, are left solely to their unselfish and honest decision."
It appears to me that there is no liability attaching to the aforesaid transaction. The officers and directors appear to have acted in good faith, for the benefit of the stockholders and the company. I believe they exercised an honest judgment and betrayed no trust.
 THE COMPANY'S INVESTMENT IN ITS OWN SHARES.
From time to time the company made investments of its surplus funds in its own New Class B common stock. The defendants contend that such investments were all made for proper corporate purposes, and resulted not only in large profits when such stock was sold but also the receipt meanwhile of a larger return on the money invested than could have been secured in any other proper investment.
The board of directors of the defendant company treated the profits realized on the sale of investment stock as well as the dividends thereon as part of the "Annual Profits" of the company within the meaning of the by-law. The complainants contend that when the corporation bought its own stock it ceased to be outstanding; that it was dead; that profits realized on the sale of such shares was not an item of earnings, and that the payment of dividends by the company to itself was merely putting money from one pocket into another. Hence they say it was improper for defendants to include the profits and dividends in the annual profits of the company, and that the directors must account for all of the participations paid on such profits and dividends.
Complainants also contend that purchases by the company of large blocks of its New Class B common stock between 1929 and 1932 were made to protect the investment of directors in the shares of the company and were not made for proper corporate purposes. *Page 351 
The defendants, on the other hand, have proved to my entire satisfaction that in each instance the directors caused the company to purchase these shares for what they believed to be a proper corporate purpose. The net result of these purchases were profits in excess of $8,000,000.
The defendants further assert that by July, 1933, the company had sold the last of its own shares held in its investment account; that for several years it advised the stockholders in its annual reports of the purchase and sale of its shares, the profit it was making and that the profit and dividends were being added to the company's earnings, and that no stockholder complained until the Bookman bill of complaint was filed in November, 1940.
The first purchase made by the company of its own shares was the United Cigar Stores purchase. The United Retail Stores Corporation had acquired 86,800 shares of the company's New Class B common stock. This company, being in the retail tobacco business and holding this block of stock, let the rumor spread that it could sell tobacco products at cost because of the dividends it was receiving on a big block of Reynolds stock. When this rumor reached the company in Winston-Salem through its sales force, Mr. W.N. Reynolds, president of the company, went to New York to see Mr. Whelan to try to induce him to stop the circulation of these rumors.
When he entered Mr. Whelan's office by appointment, Mr. Whelan, before Reynolds could mention the rumors, asked Mr. Reynolds if he would buy the stock. Mr. Reynolds asked for and received an option to buy the entire block of stock at about $33.74 per share.
Mr. Reynolds took this option to C.D. Barney Company, brokers in New York, and asked them to take it off his hands without profit and distribute the stock. At that time the stock was not listed on any exchange and was traded in over the counter. A junior partner, John W. Hanes, was in favor of taking over the option, but Mr. Harding, head of the firm, declined to take the whole or any part of it.
Mr. Reynolds then went to Bernhard, Scholle Company, another brokerage house, and offered the option to them without *Page 352 
profit to himself. That company said they would take 10,000 of the shares provided Mr. Reynolds, Messrs. Bowman Gray, James Gray and Williams would take a substantial block.
Mr. Reynolds then telephoned to Mrs. R.J. Reynolds thinking she might take a large block, but she only would agree to take 5,000 shares. On his way back to Winston-Salem Mr. Reynolds says he got the idea that since the stock was being bought to protect the business of the company, it might be proper for the company to take so much of the stock as he could not sell to individuals. He was able to dispose of all but 64,000 shares of this block of stock, Bernhard, Scholle Company taking 10,000, Mrs. Johnston (formerly Mrs. Reynolds) taking 5,000 shares, S. Clay Williams taking 2,050 shares, and the company placing the remainder with other officers.
On December 1st, 1921, the directors unanimously adopted the following resolution:
"Resolved, That it is for the best interests of R.J. Reynolds Tobacco Company to purchase the 64,000 shares of its New Class B common stock now owned by the United Cigar Stores Company and offered at $33.7332257 per share, interest on purchase price at 6 per cent to be paid from last dividend date to conclusion of purchase, same amounting to $0.3605283 per share.
"Resolved, further, that the Treasurer be and he is hereby authorized and instructed to make purchase of this 64,000 shares of this Company's New Class B Common Stock on the basis above stated, and upon delivery of certificates representing the stock to make payment of both the purchase price and the interest from the funds of the Company, and pending further instruction from the President or Board of Directors, to carry said stock in the name of such person as shall be denominated by the President for that purpose."
Mr. Williams, who at the time was in the law department and not a director, had advised the directors after examining the authorities that it was proper for the company to make this purchase of stock.
The company instructed one of its New York banks to pay United Cigar Stores for the entire block of stock, and upon its receipt to deliver 5,000 shares to Mrs. Johnston against her check, 10,000 shares to Bernhard, Scholle Company *Page 353 
against its check. Mr. Williams paid for his stock partly in cash and partly with a note to the company secured by the stock, which note was promptly paid with interest.
This purchase proved over the years to have been extremely profitable. Complainants now charge that Mr. Williams was wrongfully allowed to purchase the above mentioned 2,050 shares and that he should account for the profit realized thereon, and that in fact the entire block was purchased by the company.
It seems to me that this explanation of the transaction given by Mr. Gray is conclusive:
"Mr. Reynolds had made every effort he knew how to make to sell stock and he hadn't succeeded in selling more than the difference between 64,000 shares and the total block, which as I recall was 86,800 shares. In other words, the company was buying what he had not succeeded in personally selling.
"Q. That is, that takes into account the 2,162 shares which were purchased for exchange for common? A. I was considering that as well because it was being exchanged for common and the common itself was resold to employees for cash or bills receivable.
"Q. Now, Mr. Gray, what was the primary purpose of the company in buying this 64,000 shares of United stock? A. To get it away from United Retail Stores Corporation."
The defendants say that the fact that the company originally paid to United Cigar Stores Corporation the consideration for the whole block was merely for convenience in closing the transaction. The stock, other than that sold to Bernhard, Scholle Company and Mrs. Johnston, was delivered to the company and did not come into the possession of the employees until it had been paid for, except that a part of the purchase price of Williams' stock was paid by his note, which was secured by collateral, in accordance with a resolution of the board of directors. This note subsequently was paid in full. These transactions seem to have been conducted in a proper and business-like manner.
Complainants charge the defendants with liability for the sale of 20,000 shares of the above mentioned United stock pursuant to the following option: *Page 354 
 "Winston-Salem, N.C. January 9, 1922.
Mr. John W. Hanes, C.D. Barney Co., 15 Broad Street, New York City.
Dear Sir: —
This letter will serve as a confirmation of recent conversation to effect that we hereby give you and your associates an option on twenty thousand (20,000) shares of R.J. Reynolds Tobacco Co., New Class `B' Common Stock, at a price per share of $33.75, plus accrued dividend at the rate of dividend last declared prior to the exercise of such part of the above mentioned option as at that time is availed of, said option to be in effect on and after the listing of said shares on the New York Stock Exchange, and to expire at the end of eighteen months from date of listing on the New York Stock Exchange, provided, however, that should the `pool' hereinafter mentioned be liquidated prior to eighteen months after the listing of the stock on the New York Stock Exchange, then this option shall expire at the time of the liquidation of said `pool.'
It is understood by both you, your associates and ourselves that this option is given exclusively for the purpose of assisting you and your associates to form and operate a `pool' to `protect' the shares of New Class `B' Common Stock of R.J. Reynolds Tobacco Company on the New York Stock Exchange after listing, and that it is understood that the option will be exercised only when and as needed in the operation of said `pool.'
Yours very truly,
 (Signed personally by W.N. Reynolds, S. Clay Williams, James A. Gray and Bowman Gray.)"
I believe the testimony given by the defendants and find that this was a company option. Williams testified that the purpose of giving the option was to protect the stock on the New York Stock Exchange if and when it should be listed, and to secure a wider distribution of the stock. He said:
"We were bringing the stocks of R.J. Reynolds Tobacco Company to New York and putting them on the New York Stock Exchange for trading by any and all comers who saw fit to trade therein. We knew very little about it. Our advice had been from other people familiar with the listing of industrial shares on the Exchange that it was quite a hazardous sport for industrial management to list its company's shares on the New York Stock Exchange without having some brokers in New York not only familiar with the shares of *Page 355 
that particular corporation, their values, their earning capacity, and the management of the company, but having that broker directly interested in those shares. It was in the service of that deficiency of status that Reynolds had in New York prior to the listing of its stock that this option was given."
Mr. Gray testified:
"As I recall it, the financial statement was published on March 6th, 1922, and we promptly thereafter made application to list the shares, and the shares were admitted to list about March 16th, 1922. It was important that, before the shares were listed on the exchange, the sponsorship should be arranged. The sponsors, in turn, had taken the position — I am speaking now of C.D. Barney Company — that, if they accepted this sponsorship, they would want an option on some stock, for a double purpose: First, to have some stock to sell to other people who might be interested in becoming stockholders of the company, which was the primary purpose. One of our primary purposes in listing was to broaden the stockholder list.
"Secondly, they felt that they should have an option so that, if they were going to support the stock in the event of a short raid and probably assume a loss in such protection, they should have an option at a price slightly below the market so that they would have an opportunity to at least recoup any losses they might sustain in protecting the stock in a short raid.
"It was important that this option be given them prior to the actual listing, in order that they could organize the sponsoring group.
"You will recall that the exhibit which you have just shown me refers to their proposed organization of a pool.
"I would like to stop in my main recital long enough to say that I did not have any interest in that pool and, to the best of my knowledge and belief, no director of R.J. Reynolds Tobacco Company had any interest in that pool. I was invited into the pool, but I declined to enter into it because I did not want to be in the position of profiting from any operation in the company's interests. *Page 356 
"Going back to the main point, the option was given them, and they had an opportunity to get the pool organized and ready to operate at the time we listed the stock about two months later. When the option was signed by the four of us individually, it will be recalled that, in the month previous thereto, the company had purchased the 64,000 shares of United stock as a temporary investment. The market on the stock in early January was only slightly above the cost of the United stock the month before. As it was important for the sponsoring group to have an option slightly below the market, the contrast between the cost of the United stock to us and the market price at that time was about two points, which enabled us to give the sponsors an option slightly below the market and at the same time not below the cost of our stock. As a matter of fact, as I recall it, the United stock stood on our books at 33.74, with a possible fraction, and we gave the option to Barney at 33.75, or, in stock exchange terminology, 33 3/4, approximately one cent above the cost of the stock to us the month before."
When asked why the option was not signed by the company rather than the four individuals, Mr. Gray testified:
"In our opinion, it was not a proper thing for an option to be outstanding in the street in New York signed in the name of R.J. Reynolds Tobacco Company, and the four of us individually agreed to sign the option individually, with the distinct understanding that the 20,000 shares, if taken by Barney, were to be 20,000 shares of the United block."
The option itself shows that it was given for this purpose. It was to be availed of on and after the listing of the shares on the New York Stock Exchange. Its purpose apparently was "to protect the shares of New Class B common stock of R.J. Reynolds Tobacco Company on the New York Stock Exchange after listing."
The option price was the cost per share to the company of United stock which it had acquired in December, 1921, plus 1c per share. The option was given in January instead of in March, when the stock was listed, because it was necessary for C.D. Barney 
Company to make their arrangements to perform their duties under the option agreement. *Page 357 
Mr. Williams testified that it was the understanding of fellow officers and directors that the corporation was to furnish the stock and that it did furnish the stock under the option.
Mr. Gray testified that so far as he was concerned he did not have at the time 5,000 shares of B stock which would have been his proportion of stock to furnish under the option if it had been an individual option instead of a company option.
At a meeting of the board of directors held on March 2d 1922, the following resolutions were adopted:
"Resolved, that application be made to the New York Stock Exchange for the listing of the $10,000,000 of Common Stock, the $50,000,000 of New Class B Common Stock, and the $20,000,000 of Preferred Stock of this corporation, and that James A. Gray, Vice President, be designated by the corporation to appear before the Committee on Stock List of said Exchange, with authority to make such changes in said application, or in any agreements relative thereto as may be necessary to conform with requirements for listing."
"Resolved, that the President be, and he is hereby, from the time of the Company's acquisition of said stock, clothed with authority to sell for the company, whenever he sees fit and at such price or prices, not below cost, as he deems proper, any part or all of the New Class B Common Stock of the Company purchased by the Company during December, 1921."
Mr. Williams testified that at this meeting and prior to the adoption of these resolutions, the board of directors in his presence was informed, "that in connection with the listing of the stock on the New York Stock Exchange, all of the advices that we had had from officials of the Exchange and other persons was to the effect that it would not be advisable to list that stock on the Exchange with as few stockholders and as limited distribution as we had at that time, except as in connection with the listing we arranged for something that might be called a sponsorship for the stock, which did not do anything particularly with respect to it except to carry an interest in it, watch its course, and be sure it was not ill-treated or suffered unwarranted experiences on the Exchange. It was further expressed that the Barney brokerage house, which had carried an intensive interest and quite an extensive activity in Reynolds Tobacco stock for a number of years *Page 358 
theretofore, was probably the appropriate and proper, the most effective sponsor for that stock."
The class B common stock authorized in 1917 was sold to stockholders one-half, or 50,000 shares, on April 1st, 1918, at par. Seventeen shares of the 50,000 shares offered were not subscribed for by stockholders, but they were issued, apparently by order of one of the officers now deceased, to Mr. Orr, secretary of R.J. Reynolds.
On July 1st, 1918, when the second lot of 50,000 shares of B stock were issued, 21 2/3 shares were not subscribed for by stockholders, and these shares were issued to Mr. Orr. By virtue of its ownership of the 17 shares above mentioned, the company had the right to subscribe for 5 2/3 shares on July 1st. These 44 1/3 shares were issued to Mr. Orr, the cost being absorbed by undivided profits. The one-third share was sold on August 10th, 1918, for $33.34. The 44 shares were treated by the company as shares which had been issued.
When the transaction occurred only two of the present defendants were directors of the company, and it does not appear that they had knowledge of it, nor does it appear that those who subsequently became directors had knowledge of the fact that this stock was not actually issued until it was later sold by the company. The transaction has all the appearances of being, and I believe it was, an honest one. When the shares were eventually sold, the company received $35,090.46, which is indicative of a beneficial corporate transaction. This profit over the subscription price of those shares was included in the company's profits, and being so included it followed that participation was paid thereon.
Complainants charge that this was a capital transaction and the inclusion in the profits was wrongful and a breach of trust. It occurred many years ago, long before complainants purchased any stock, and I find no taint of wrong or breach of trust involved in it.
The next large purchase by the corporation of its New Class B common stock for investment purposes occurred in 1928. The testimony shows that the sale of the Lucky Strike cigarettes of American Tobacco Company was increasing by leaps and bounds. Camel sales were declining. Luckies sold *Page 359 
to distributors on a slightly better basis than Camels, and American accordingly had more money available to advertise and push Luckies than Reynolds did. The management thereupon cut the price of Camels in order to force American to reduce its price, which would leave it with less funds available for advertising.
Following this price cut large blocks of the Reynolds B stock were dumped on the New York Stock Exchange. The directors met and agreed individually and severally to invest about $8,000,000 in the B shares. They placed their orders separately through different brokers. After their purchases had been made large blocks of New Class B stock owned by Mrs. J.B. Duke, widow of the former head of the tobacco trust, were shown by the company's transfer sheets to have been sold on the market.
The directors concluded that a raid on the Reynolds stock was in process. Whereupon the directors passed a resolution at a special meeting, authorizing the company to purchase 44,000 shares, which cost $5,000,000. The directors personally had purchased 62,200 at a cost of $8,209,000.
These purchases accomplished their purpose. Before the end of the year all the 44,000 shares the company had bought had been sold, with a net profit to the company of $1,091,129.50, or 20% on the money invested. The directors by the year end had sold only 18,200 of the shares they had bought.
Complainants charge that most of the directors who bought these 62,200 shares bought them on margin from banks or brokers, and that when they induced the company to purchase its 44,000 shares it did so to protect the directors' investment and help bolster up the stock and keep it from going further down.
According to the testimony, the officers and directors of the defendant viewed with alarm the increase in the sale of Lucky Strikes and the decrease in the sale of Camels. They cut the price of Camels from $6.40 to $6.00 per thousand. Mr. Williams said that Reynolds was in a terrific business battle and that it was the most dangerous threat the company had ever run into. *Page 360 
Had the directors gone into this matter as a speculation, it is to be assumed that they would wait until the Reynolds B stock had gone away down rather than attempt to plug it immediately after the price cut. Their purchases were at considerably higher prices than the company's purchases. Had they intended to profit at company expense, it is to be assumed they would have sold their shares first and after they received a profit would have sold the company's shares.
That they permitted the company to get out first at a profit of over a million dollars and make a profit of 20% on the money invested, while they retained their stock and realized only a 7 or 9% advance on what they sold, indicates the high purposes of the directors. That was no breach of trust.
The complainants charge that in December, 1928, a group of Reynolds directors and officers entered into a syndicate agreement with C.D. Barney Company to speculate in the B stock of the company, and that the company bought some of its investment stock from the syndicate in the fall of 1929.
The defendants' explanation of the Chas. D. Barney Company syndicate agreement is as follows: Late in the year 1928, John W. Hanes of Chas. D. Barney Company, represented to Mr. Williams that although the Tobacco Company had a very fine record, good earnings and a high rate of dividends, it had not been recognized for its real value among investors generally. It then had outstanding 10,000,000 shares of B stock, less than 6,000 stockholders, and 2,000,000 shares of its B stock were in brokers' hands. Chas. D. Barney Company had for some years been interested in tobacco stocks and particularly in stock of the R.J. Reynolds Tobacco Company. Barney proposed to form a syndicate for the purpose of bringing the stock to the attention of investors generally.
Mr. Hanes inquired of Mr. Williams as to whether some of the directors would take an interest in the syndicate. The Tobacco Company was interested in enlarging its stockholder list because it recognized the danger inherent in a large number of shares outstanding in the hands of a comparatively small number of stockholders. They believed that the syndicate would be helpful in enlarging the stockholder list. Mr. *Page 361 
Gray testified that he believed the syndicate could do a constructive thing in broadening the stockholder list. It was proposed by Hanes to secure participations for 1,000,000 shares. Eight of the directors of the R.J. Reynolds Tobacco Company took less than a 15% interest in this syndicate.
It does not appear that the directors had anything to do with the management of the syndicate. Eight directors, some now deceased, joined in the syndicate arrangement and gave Barney options on their stock for distribution through the syndicate. They, the defendants say, had a large part of this stock which they had bought at the time the price of Camel cigarettes was reduced in the spring of 1928, and which they had refrained from selling; and while they hoped to dispose of this stock and to make a profit, they were also actuated by their desire to promote the interest of the company by securing a wider distribution of the stock among the public generally. In no single instance, the defendants maintain, did Chas. D. Barney Company consult the Reynolds directors whether they should buy or sell. Barney gave no information whatsoever as to the operations of the syndicate to a Reynolds director. It was released from the several option agreements given by the eight Reynolds directors October 17th, 1929. The syndicate operated at a loss and the directors instead of profiting thereby sustained heavy losses.
Both Mr. Williams and Mr. Gray testified that they knew nothing about two accounts that were revealed when complainants took the depositions of a representative of Chas. D. Barney Company. These accounts were known as No. 8000 Account and Reynolds Sales Account No. 1. It was not established that the company ever purchased any stock from a director.
Mr. Williams testified that the stock which he received from the syndicate was worth "definitely less than the price at which it was charged out to me under the dissolution of the syndicate."
The final purchase by the company of its New Class B common stock for investment occurred at the time of the market crash in 1929. That year the company was enjoying great prosperity. Camel cigarette sales were up over *Page 362 
600,000,000 from those of 1928; it had a large inventory of leaf tobacco, and its profits were the best it had ever had. When the market broke the company had surplus funds consisting of $12,000,000 in cash and $17,000,000 in government securities, with no immediate prospect of needing them in the business. The return on government securities was then about 3%. The company had paid three quarterly dividends of 60 cents a share and contemplated paying 75 cents a share at the year end.
At the September, 1929, dividend date the company had only 9,136 B stockholders, who held a total of 10,000,000 shares of the company's stock. Twenty-three per cent. of the stock, or 2,000,000 shares, were in brokers' hands. While Camel cigarettes had for many years been the leading cigarette in the country, yet the Lucky Strike cigarette of American Tobacco Company had been outselling it in 1928 and was outselling it in 1929, although the Camel sales were rapidly increasing.
The management of the company felt that the break in the market was temporary and did not envision that it was the beginning of a long depression. They felt that the stock of the company, which had been selling above $70 per share in 1929, was in a precarious position and they were fearful of the effects of a serious raid on the stock, which at that time was a not infrequent occurrence in the market. Accordingly the directors decided to invest so much of the company's surplus funds as might be necessary in the stock at $50 per share, believing that the returns would be double what they were receiving on government bonds and expecting that the stock would stabilize itself above $50 per share.
With proper directors' resolutions the management purchased all the stock that was offered in the market at $50 per share for two weeks beginning October 29th. On the night of November 13th, on the advice of its brokers, the company put in a scale order for a certain number of shares at prices scaling down from 50 through 39 and lower. This order was filled down to 39 at the opening of the market on November 14th. Thereafter the company made no purchases until October, 1930. The stock rose from 39 through 48 in 1929, in *Page 363 
which time the company sold part of the stock it had acquired and continued selling until the market broke again in the fall of 1930.
The company's financial statement at December 31st, 1929, shows on the asset side: "Investments in Non-competitive companies,c., $19,601,594.77."
The investment in non-competitive companies shown on the December 31st, 1930, statement was $9,455,147.02, with a footnote which read:
"Consisting almost entirely of company's own stock at which the investment is below market price at December 31st, 1930."
The letter to stockholders which carried this statement, dated January 14th, 1931, said:
"As noted in the statement, the Company holds shares of its own stock which are carried at a figure less than market price at December 31, 1930, and which represent employment of surplus cash at a far greater yield than could be obtained from any equivalent high-grade security. During the past year the Company sold a block of the shares previously acquired and the profit from the sale was applied in reduction of the cost of the shares still held. No part of the earnings shown in the Treasurer's report for the year was derived from the sale of stock."
On January 13th, 1932, the company's president, Mr. Williams, wrote a letter to the stockholders, in which he, among other things, said:
"Net current assets at December 31, 1931, amounted to $128,242,251.20. In addition to this, as noted on the statement, the Company has an investment in shares of its own stock at a figure which is less than market price at December 31, 1931. This investment, somewhat larger than that at the close of the preceding year, produces a very attractive yield as compared to what could be obtained from any equivalent high-grade security in which surplus cash funds could be placed. No part of the earnings shown in the Treasurer's report for the year was derived from the sale of stock."
With the letter was enclosed the company's financial statement which showed investment in non-competitive companies at $13,413,287.26 with a footnote stating that it consisted almost entirely of company's own stock in which the investment was below market price at December 31st, 1931. *Page 364 
Mr. Williams, on January 12th, 1933, wrote a letter to all the stockholders, in which appears the following:
"As noted on the statement, the Company has an investment in shares of its own stock somewhat larger than a year ago, which produces a very attractive yield as compared to what could be obtained from any equivalent high-grade security in which surplus cash could be placed. No part of the earnings shown in the Treasurer's report for the year was derived from the sale of stock and, as formerly, the income from such stock is included in dividends on investments."
This letter accompanies the financial statement for December 31st, 1932, which showed investments in non-competitive companies, c., at $18,329,443.10, with a footnote stating "including 585,000 shares company's own stock — $18,208,641.83."
On January 11th, 1934, Mr. Williams, as president, wrote a letter to all the stockholders of the company, in which he enclosed the financial statement of the company as of December 31st, 1933, in which he said:
"Net earnings for the year 1933 were $21,153,721.50, or $2.11 per share, compared with $33,674,800.28 or $3.36 per share for 1932. Cash dividends of $30,000,000, or $3.00 per share, were paid in 1933. The earnings for the year 1933 include an item of $5,003,597.93, representing profit from disposal of company's investment in its own Class B shares, which was announced through the press in July, as well as dividends received on such shares before disposition."
The foregoing exhibits show that the stockholders had full information of the fact that the company had a large investment in B stock; that the dividends on that stock were substantial and were included in the profits of the company; that during the year 1933 the stock had been sold at a profit, which was also included in the net earnings.
While complainants' counsel charge that the individual defendants were guilty of breaches of trust because they bought and sold B stock in the market and because the company at various times also bought and sold B stock, they do not claim that the company sustained any loss. The undisputed evidence shows that the company on its purchases and sales of B stock realized the following profits:
 1928 ........................... $1,271,023.19
 1929 ........................... 436,581.21
 1930-1933 ...................... 5,003,597.93
 *Page 365 
The total profits that the company realized on the purchase and sale of its own investment stock between 1923 and 1933 amounted to $8,388,386.67. The participation paid officers and employees thereon was 10% thereof, or $838,838.67, of which complainants say the directors, living and dead, personally received $449,568.66. The estates of the deceased directors have been distributed; several who were directors have resigned and are not parties to this suit, and other directors who are parties did not take office until after some or all of these distributions of participations were made.
In addition to this profit the return on the money invested in defendants' shares was in excess of 7.81% on the amount invested as against a return on government securities for the period of about 2 1/2%. Moreover, at the end of the year 1933, after the defendant had sold all of its investment stock, the number of B stockholders had increased to 43,040 as compared with 9,136 in September, 1929, and by the time the bill was filed in this case the number of stockholders was in excess of 60,000.
I agree with the contention of the defendants that the corporation was within its rights in purchasing this stock.
In Chapman v. Iron Clad Rheostat Co., 62 N.J. Law 497;41 Atl. Rep. 690, Mr. Justice Dixon, speaking for the Supreme Court, said:
"This question, as it turns on common law principles, seems not to have been judicially decided in New Jersey, nor need it now be, for the provisions of our Corporation Act (Pamph. L. 1896 p.277), by which (section 20) the shares of stock in every corporation are declared to be personal property, and (section 1) every corporation is vested with power to purchase such personal estate as the purposes of the corporation shall require, except (section 3) certain designated sorts of personal property, which do not embrace shares of its own capital stock, coupled with those provisions which recognize the power of corporations to own shares of their own capital stock (sections 29, 38), plainly imply a legislative grant of the necessary power in all cases where the purposes of the corporation require it."
See Berger v. U.S. Steel Corp., 63 N.J. Eq. 809; 53 *Page 366 Atl. Rep. 68, wherein Mr. Justice Van Syckel, speaking for the Court of Errors and Appeals, said:
"There is no provision in the Corporation Act, or in the charter of the company, to support the proposition that purchases of its stock cannot be made by it on credit.
"On the contrary, as has been shown, the company has power to buy its own shares and that power is given to it in the same terms and as broadly as the granted authority to purchase other personal property. No limitation is, in this respect, placed upon it which does not apply equally to the purchase of all other property."
The complainants argue that "although the defendants treated these transactions as profit when they dealt with payments of bonuses to themselves and others, the defendants took an opposite view when they made the company's tax return and litigated the tax question in the courts."
The defendants challenge the statement and cite Helvering v.R.J. Reynolds, 306 U.S. 110, wherein it appears that the company returned the profit made in 1929 in "other items of non-taxable income" as "profit on R.J.R. stock." Mr. Justice Roberts in that case, among other things, said:
"During 1929 the company sold shares acquired in that and prior years for a sum which exceeded cost by $286,581.21, which amount was entered in the books as a cash item and added to surplus. In its income tax return for 1929, the company listed this gain under the caption `other items of non-taxable income' as `profit R.J.R. stock.'"
The Treasury regulations prior to 1934 provided:
"If * * * the corporation purchases any of its stock and holds it as Treasury stock, the sale of such stock will be considered a capital transaction and the proceeds of such sale will be treated as capital and will not constitute income of the corporation. A corporation realizes no gain or loss from the purchase or sale of its own stock."
However, on May 2d 1934, this regulation was amended by the Treasury Department to read:
"Where a corporation deals in its own shares as it might in the shares of another corporation, the resulting gain or loss is to be computed in the same manner as though the corporation were dealing in the shares of another." *Page 367 
The defendants further direct attention to the court's remarks in Helvering v. R.J. Reynolds, supra, which appear as follows:
"Since the legislative approval of existing regulations by re-enactment of the statutory provision to which they appertain gives such regulations the force of law, we think that Congress did not intend to authorize the Treasury to repeal the rule of law that existed during the period for which the tax is imposed."
The defendants say that because of the amendment of the regulation in 1934, the Commissioner of Internal Revenue determined a deficiency in the tax paid by the corporation for 1929 which led to the controversy above mentioned; and that the Supreme Court pointed out that the regulation in effect in 1929 had been in effect for many years; that meanwhile Congress had several times amended the Revenue Law without expressly changing the regulations. The regulation in effect in 1929 served no purpose except to determine taxable income under the Internal Revenue Laws.
The case of Heller v. Boylan, supra, is distinguished from the instant case by the fact that the only profits, a percentage of which was distributable under the by-law of the American Tobacco Company were "the net earnings made by the company in its business as a manufacturer and seller of tobacco and its products, after deducting all expenses and losses." The decision was based upon the court's construction of a by-law, the language of which was different from the by-law in the instant case, which permits participation on the "annual profits of the company," which I construe to mean from whatever source they are derived.
The case of Winkleman v. General Motors Corp., 44 F. Supp. 960,
cited by the complainants, involved the consideration of three bonus plans of the General Motors Corporation. The court considered the contention that the profits received by the corporation as dividends on stock owned by it in General Motors management corporation should have been excluded in so far as those profits resulted from dividends received by the management corporation on General Motors stock held by it. The court held that these profits were *Page 368 
properly included. Its determination was based, in part, upon the fact that the management corporation was not a subsidiary of General Motors, although General Motors was a large stockholder therein.
The complainants refer to the case of O'Connor v.International Silver Co., 68 N.J. Eq. 67; 59 Atl. Rep. 321:affirmed, 68 N.J. Eq. 680; 62 Atl. Rep. 408. In that case the question was whether stock of the defendant company owned by the United States Silver Company, all of the stock of which was owned by the International Silver Company, could lawfully be voted. In the course of the opinion the Vice-Chancellor quoted from Cookon Corporations as follows:
"When a corporation buys shares of its own capital stock, the capital stock is not reduced by that amount, nor is the stock merged. So long, however, as the corporation retains the ownership, the stock is lifeless, without life or power. It cannot be voted nor can it draw dividends, even though it is held in the name of a trustee for the benefit of the corporation."
I am in accord with the views of the defendants that this quotation was entirely unnecessary to sustain the court's conclusion, for in fact if the stock was owned by the International Silver Company, the prohibition contained in R.S.14:10-8, which was then section 38 of P.L. 1896, was effective to prevent the voting of the stock. In its affirmance the Court of Errors and Appeals' decision was upon a different ground than that indicated by the Vice-Chancellor. It said if the International Silver Company owned the stock, the Corporation Act, above mentioned, provided that it could not be voted, but if on the other hand the United States Silver Company was the owner of the stock, it had no directors who were qualified to act and therefore the stock could not be voted. This opinion did not declare as did Mr. Cook in his work that treasury stock of a New Jersey corporation is lifeless.
Thomas v. International Silver Co., 72 N.J. Eq. 224;73 Atl. Rep. 833, cited by the complainants, involved the right of the pledgee of the same stock to vote. The cases of McNeely v.Woodruff, 13 N.J. Law 352; Hoover Steel Ball Co. v. ShaeferBall Bearings Co., 90 N.J. Eq. 164; 106 Atl. Rep. *Page 369 471, or In re Central New Jersey Land, c., Co., 113 N.J. Eq. 332; 166 Atl. Rep. 705, cited by the complainants, do not seem to have any bearing on the point here involved.
 DIVIDENDS ON TREASURY STOCK.
Complainants seek to hold the defendants liable because between 1919 and 1933 cash dividends aggregating $5,110,081.48 on treasury stock were included in the annual profits and participation of 10% thereof was paid to officers and employees, including directors. They allege that the B shares on which those dividends were considered paid, were B shares in the treasury which had been previously issued and then reacquired by the company; and B shares never issued by the company, being stock dividends on the foregoing B shares held in the treasury, instancing that in November, 1922, and February, 1927, the company declared stock dividends of 33 1/3% and 25% respectively, on outstanding common shares, which dividends were payable in New Class B shares. The defendants allocated a pro rata amount thereof as stock dividends on the B shares held in the company's treasury; that thereafter these stock dividends were paid cash dividends amounting to approximately $500,000, which were included in company income.
They say that in the period 1919 to 1933, the directors of the company personally received amounts ranging from 63.17% to 51.68% of all the payments made to the employees and officers under the by-law, including the overpayments. They argue that the aforesaid acts of the directors were illegal.
While the complainants assert that the directors of the company, including the defendants, enriched themselves to the extent of over 50% of the amounts which they claim to be overpayments, their assertion is predicated upon the various percentages of participating stock which the then directors were alleged to have owned, at different periods. The percentage of participating stock held by the directors decreased from 96.53% in 1912 to 35.51% in 1941. *Page 370 
While the complainants complain that the annual profits under the by-law were not determined by a disinterested body or committee, or by any independent agency, the defendants' reply to that criticism is that from the year 1919 to the present time, the company accounts, including the determination of the annual profits, have been regularly audited by a disinterested and outstanding firm of public accountants, Ernst Ernst. It was a common practice before 1933 for corporations to include dividends on treasury stock in company income.
In Knickerbocker Importation Co. v. State Board ofAssessors, 74 N.J. Law 583; 65 Atl. Rep. 913, it was held that stock of a New Jersey corporation which has once been issued remains outstanding until it is retired, in accordance with the provisions of the statute.
Vice-Chancellor Lewis in Rutherford National Bank v. Black,133 N.J. Eq. 306; 32 Atl. Rep. 2d 86, among other things, said: "Stock dividends are not dividends at all, but merely a nominal realignment of capital structure as held in Eisner v.Macomber, 252 U.S. 189."
In Eisner v. Macomber, 252 U.S. 189, the court said:
"Thus the surplus may increase until it equals or even exceeds the par value of the outstanding capital stock. This may be adjusted upon the books in the mode adopted in the case at bar — by declaring a `stock dividend.' This, however, is no more than a book adjustment, in essence not a dividend but rather the opposite; * * *."
It was testified by Mr. Gray that when the stock dividend shares were received the number thereof was noted on the books of the company, and that this notation decreased the book cost per share of the stock held; and when the stock dividend of 14,442 2/3 was received, the total cost of the B stock owned by the company, instead of being divided by 43,328, in order to ascertain the cost per share, was divided by 43,328 plus 14,442 2/3 or 57,770 2/3.
The complainants contend that reacquired stock is not outstanding stock, and that it is not an asset when held by the company, and that it is in nowise affected by any capital readjustment. In so contending, they do not stand on solid *Page 371 
ground. See Chapman v. Iron Clad Rheostat Co., supra. InHoops v. Leddy, 119 N.J. Eq. 296: 182 Atl. Rep. 271, it is indicated that stock is property, and that therefore the provisions of our Corporation Act authorizing a corporation to "hold, purchase and convey such real and personal estate as the purposes of the corporation shall require" empowers a corporation to purchase its own stock, although no express authorization for such purchase may be contained in its charter. See Pabst v.Goodrich, 113 N.W. Rep. 398, in which the court said in part: "A corporation clearly has the right to purchase its stock, keep it alive, and treat it as assets." Amelia H. Cohn Trust v.Commissioner of Internal Revenue, 121 Fed. Rep. 2d 689,691. See Rutherford National Bank v. Black, supra; Eisner v.Macomber, supra.
While the complainants take the position that the acquisition and reissuance of shares of the corporation are capital transactions which do not result in profits, their stand is not supported by the principles enunciated in National NewarkBanking Co. v. Durant Motor Co., 124 N.J. Eq. 213: 1 Atl. Rep.
2d 316; affirmed, 125 N.J. Eq. 435; 5 Atl. Rep. 2d767. In the latter case the court among other things said:
"Petitioner desires to exclude from income available for dividends, profits from the sale of capital assets, or from the settlement or acquisition of any of its capital securities or other obligations. Profit from the sale of a capital asset — unless the company be in liquidation — enters into earnings or surplus account and is a proper source of dividends. Hyams v.Old Dominion Copper, c., Co., 82 N.J. Eq. 507; 83 N.J. Eq. 705.
The result of settlement of a debt at a discount depends on the origin of the debt. If it was incurred as an operating expense, then the settlement produces an operating credit and affects profit and loss. The purchase of shares of the company's own stock and resale at an advance would, of course, produce a profit."
See Helvering v. R.J. Reynolds Tobacco Co., supra; Allen v.National Manufacture and Stores Corp., 125 Fed. Rep. 2d239; Commissioner of Internal Revenue v. Air Reduction Co.,Inc., 130 Fed. Rep. 2d 145. *Page 372 
By-law XII had been adopted by the stockholders. They knew, or were charged with notice of its provisions. Brent v. Bank ofWashington, 10 Peters 596; Kocher v. Supreme Council Cath. Ben.Legion, 65 N.J. Law 649; 48 Atl. Rep. 544; Miller v.Hillsborough Mutual Fire Association, 42 N.J. Eq. 459;7 Atl. Rep. 895; Baumohl v. Goldstein, 95 N.J. Eq. 597;124 Atl. Rep. 118.
As hereinbefore stated, notice of the defendant's plan providing for participation by officers and employees in certain profits of the company was printed on the face of each stock certificate. Mary B. Healey, the intervenor herein, was one of the stockholders who received the aforesaid letters and financial statements; she did not, at any time, raise any objection until months after the bill of complaint by the Bookmans was filed. I am in full accord with the statement of the defendants that while the other complainants and intervenors owned no stock in the company at the time these dividends were included in profits,they are bound by the notice to and knowledge of theirpredecessors in title and by the acquiescence of suchpredecessors. Trimble v. American Sugar Refining Co., 61 N.J. Eq. 340; 48 Atl. Rep. 912; Hodge v. U.S. Steel Corp., 64 N.J. Eq. 90; 53 Atl. Rep. 601 (reversed on another point, 64 N.J. Eq. 807; 54 Atl. Rep. 1); Solimine v. Hollander, 128 N.J. Eq. 228; 16 Atl. Rep. 2d 203; Matthews v. Headley ChocolateCo., 100 Atl. Rep. (Md.) 645.
See Haslett v. Stephany, 55 N.J. Eq. 68; 36 Atl. Rep. 498.
In U.S. Steel Corp. v. Hodge, 64 N.J. Eq. 807;54 Atl. Rep. 1, Mr. Justice Van Syckel, speaking for the Court of Errors and Appeals, said:
"In Haslett v. Stephany, 10 Dick. Ch. Rep. 68, Vice-Chancellor Pitney said: `For these reasons I think that the facts above stated, which were clearly within defendant's knowledge, were sufficient to put him upon inquiry. The general doctrine that facts which are sufficient to put a party upon inquiry are sufficient to charge him with all such knowledge as he would have acquired by a proper inquiry, in the ordinary course of business, is, as I take it, thoroughly established in this state. It was so held in the Court of Appeals *Page 373 
in the case just cited (6 C.E. Gr. 463), and that case followedHoy v. Bramhall, 4 C.E. Gr. 563, in the same court. The doctrine of these cases has always been followed in New Jersey.'
"The cases in England are to the like effect. Phosphate ofLime Co. v. Green, 7 C.P. 43; Hay v. Chapman, 16 Mees. W.355.
"The stockholders of the company are therefore chargeable with express notice that some directors were interested in the bankers' contract, and by reasonable inquiry at the meeting of May 19th they could have ascertained the names and number of such directors."
Vice-Chancellor Van Fleet in Rabe v. Dunlap, 51 N.J. Eq. 40;25 Atl. Rep. 939, said:
"The principle which must control the action of a court of equity, in cases where the defense is laches, was laid down by Lord Camden, many years ago, in these words: `Nothing can call forth the activity of a court of equity but conscience, good faith and reasonable diligence. Where these are wanting the court is passive and does nothing. Laches and neglect are always discountenanced, and therefore from the beginning of this jurisdiction, there was always a limitation to suits in equity.'Smith v. Clay, reported in a note to Deloraine v. Brown, 3Bro. C.C. 639 (Amb. 645). This principle, as it is applied to stockholders who are tardy in seeking protection against actsultra vires of the corporation, was expressed by Sir John Romilly, master of the rolls, in Gregory v. Patchett, 33 Beav.595, 602, in this form: `Shareholders cannot lie by, sanctioning, or by their silence at least acquiescing in an arrangement which is ultra vires of the company to which they belong, watching the result; if it be favorable and profitable to themselves to abide by it and insist upon its validity; but if it prove unfavorable and disastrous then to institute proceedings to set it aside.'"
I have heretofore held, as above mentioned that by-law XII in this case operated upon the annual profits of the company from whatever source derived. This by-law is sui generis. If upon receipt of the notices and letters telling of the profits being made by the company on the sale of its own stock and *Page 374 
the inclusion of dividends thereon in the profits, any stockholder had had any desire to know whether participations were being paid thereon, it would have been a simple matter to have inquired of the company. Since no inquiries were made and no complaint was made until the bill in this case was filed, seven years after the matters complained of were terminated, the doctrines of laches, estoppel and acquiescence clearly apply.
Another of complainants' contentions is that the directors for their own benefit and advantage wrongfully failed and neglected to deduct the total amount of the participation fund as an expense of the company in each year before calculating the participation.
The by-law under consideration in this case apparently differs from that involved in any other decided case. The first question for the directors to decide in each year is what is the amount of the "Annual Profits?" Then the directors may declare a percentage of such profits as participation and decide what employees are entitled to participate therein.
I am satisfied that the directors in making their decision had no thought of taking an unfair advantage of the other stockholders, and I believe their method of handling was correct. See Selz v. Buel, 105 Ill. 122, 130, 131; Epstein v.Schenck, 35 N.Y. Supp. 2d 969.
 DISTRIBUTION TO EMPLOYEES OF STOCK OF THE R.J. REYNOLDS ESTATE.
In 1927 the employee demand for the company's common stock was very great. At that time 1,067 officers and employees owned 253,353 shares. At the end of 1928, through the transactions to be hereafter mentioned, 2,177 officers and employees owned 340,015 shares of $25 par value stock.
This was accomplished principally through the purchase of 74,045 shares of common stock from the Safe Deposit and Trust Company of Baltimore as trustee of the estate of R.J. Reynolds. Mr. Williams negotiated the purchase of these shares and the contract of purchase was signed by the three top officers of the company, W.N. Reynolds, Bowman Gray *Page 375 
and James Gray. It expressly stated that the purpose of acquiring the stock was for distribution to officers and employees so that they might participate under the by-law. It provided for installment payments of the purchase price over a long period of time. The price was $194.475 per share. The initial payment was $14.475 per share, and thereafter payments were at the rate of $25 per share for each year commencing January 20th, 1929, until January 20th, 1933, when a final payment of $80 was required.
At the time of this contract of purchase, December 8th. 1927, the company had in its No. 2 Account awaiting distribution to employees 19,563 shares of common stock which had cost the company an average price of $184 per share, and the trustee under the will of Kathryn S. Johnston agreed to exchange 14,546 common shares for B shares on the basis of $194.75 per share. The company planned to make the widest distribution it had ever made, and to bring the price down it averaged in the company owned shares costing $184 per share with the other shares that cost $194.75 per share, and offered the stock to all company employees at that price. It was subscribed for by approximately 2,000 employees. The directors bought and paid for about 20% of the stock and the balance went to other officers and employees.
Incidentally, every officer and every director of the defendant company had always been a full-time employee.
The directors and all employees paid the same price per share, Messrs. Reynolds, Bowman Gray and James Gray by signing the contract with the Baltimore Company obligated themselves personally for payment of the price, which aggregated over $14,000,000. The company did not become an obligor on this contract because the directors were unwilling to fasten on it such a liability running over such a period of years.
A large portion of this stock was sold to employees on installment contracts which provided that their payments should be made to the defendant company. The company collected these payments and made remittances to the Safe Deposit and Trust Company in Baltimore in accordance with the terms of the contract. *Page 376 
In January, 1929, as above stated, each share of common stock as well as B stock of the company was converted into 2 1/2 shares of stock of the par value of $10 per share. Because of death, resignations and the economic distress caused by the depression, many of the minor employees defaulted and the company took over their stock. When the defaults first occurred the company paid the defaulting employee the difference between the market price of the stock and the amount which he owed on account of the purchase price. Later the company discontinued the purchase of shares at the market price but purchased the shares at the cost of the stock to the employee, plus interest, less dividends received by him and less participations received by him with respect to the stock, and less the amount which the employee still owed on the stock. The stock was purchased for resale to employees under the plan that had been in existence since 1920.
The defendants say that under neither of these methods did the company acquire the stock at more than its then market value. The second method was adopted, defendants say, because the company felt they were securing the stock at a better price, and which was fair to the employee. Gray testified that in every instance the employee was satisfied with the purchase on this basis, although he believed that on the purchase under the system later adopted that the employee received a lower price than the market price of the stock less his indebtedness. No director defaulted in payment for his stock.
This course, the defendants say, was adopted by the company in order to preserve the morale of its employees, and not for the purpose of relieving Reynolds, Bowman Gray and James Gray of any liability to the Baltimore Trust Company as complainants charge. Gray testified:
"Q. Would it, in your judgment have been an advantage or a disadvantage to the company had you taken over the stock at the amount at which the employees owned? A. I think it would have been a disastrous thing for the company, because of several reasons: First, an employee having his stock foreclosed and knowing that three of the top executives of the company were buying it at bargain prices, it would *Page 377 
have created a very serious state of morale among those men. Furthermore, the company in buying those shares from those men, were simply buying additional shares to resell to employees at an opportune time, as had been the policy of the company since 1912, as previously testified to in many instances."
The defendants contend that in the Baltimore shares transaction the company sustained no loss, and the directors derived no benefit therefrom; and the stock, they assert, was worth more than cost when the Retirement and Group Insurance Plan was established, as hereafter will appear.
The defendants argue that had this stock been sold at private or public sale, these three directors would either have had their liability completely discharged or would have purchased the stock at more than $9 per share below its lowest market value on August 31st, 1933; and that had they purchased the stock they would have received as a group additional participations for the years 1929 to 1934 of $282,944.35, and regular dividends of $339,068.25, or a total income from it of $622,012.60.
I believe that in this transaction the only purpose the directors sought to serve was company benefit. While the complainants charge them with trying to fasten their own liability onto the company and with having the company relieve them of liability, the whole purpose, as evidenced by the contract with the Safe Deposit and Trust Company, was to distribute the large block of stock of the R.J. Reynolds estate among the employees at the lowest possible price and the best terms of payment. Had there been any intention on the part of the directors to take advantage of their position, it is to be assumed that they would have bought from the company the shares of stock which cost it $184 per share instead of paying $191.745 as did every other employee.
 EXCHANGE OF THE 100,000 SHARES OF STOCK.
The stock which the company bought from defaulting employees as above recited was carried in one of the Reynolds Special Accounts for resale to employees when there was a *Page 378 
demand. The company continued to buy its common stock for this purpose, some of the purchases being made on the New York Stock Exchange in Mr. Williams' personal brokerage account. He said this was done at the request of the president, Bowman Gray. Mr. Williams left a standing order for the common stock below the market so as to pick up any odd shares that might be offered and so as also to prevent any wide fluctuation in the quoted price.
By the end of 1932 the company had close to 100,000 shares of the common stock in its special accounts available for employees, but the average cost thereof was about $67 per share, which the directors felt was too high a price to justify an offering at the time.
The evidence is that late one afternoon Mr. Reynolds walked into Mr. Williams' office and discussed the possible distribution of this stock, and they agreed the price was too high. Mr. Williams then suggested that if the four top officers would agree to exchange with the company 100,000 shares of their common stock for 100,000 shares of its New Class B common stock on a share for share basis, the cost of the common stock would be brought down to about $50 per share, at which it could readily be distributed to the employees. As a result of this conference Messrs. Reynolds, Bowman Gray, James Gray and S.C. Williams addressed letters to the company agreeing to transfer to the company an aggregate of 100,000 shares of common stock in exchange for 100,000 shares of B stock, "in order to enable you to offer to employees of the Company some R.J. Reynolds Tobacco Company common stock at a more attractive price than would otherwise be possible."
Mr. Williams traded 10,000 shares of common stock owned by him for 10,000 shares of B stock owned by the company, and Mr. Reynolds, Bowman Gray and James Gray each traded 30,000 shares of common stock they owned for 30,000 B shares of stock owned by the company.
Complainants have pointed to the transfers of these large blocks of B stock to the four directors and the price at which they were charged out as indicating self-dealing and fraud. Mr. Gray explained in great detail that the cost of the B *Page 379 
stock to the company was $33.606 per share and he showed how that price was arrived at.
The market price of this stock at the time was about $34 per share. The common shares were actually delivered to the company in exchange for the B shares at various times in 1933 commencing in April and ending in August depending upon the convenience of the individual director.
The cost to the company of its 100,000 common shares, none of which were bought in excess of market, was $67 per share and such shares were currently being traded in excess of $60 per share, so that at the lower value the 100,000 shares of common stock traded by Messrs. Reynolds, Bowman Gray, James Gray and S.C. Williams was about $2,600,000 in excess of the value of the B shares they received in exchange. Moreover, the defendants by this exchange gave up their right to participation on the common shares and no one of them thereafter participated on any of such shares. Certainly it cannot be charged that these four directors were actuated by any selfish motive in making this exchange, which cost them in values $2,600,000 and a permanent loss of participation so long as they should remain employees of the company.
 INSURANCE AND RETIREMENT INVESTMENT FUND.
At the September, 1933, meeting of the board of directors Mr. Lasater suggested that the 200,000 shares of common stock held in the special account for sale to employees be set up in trust to finance the company's pension and insurance plans. Company officials had had discussions with representatives of one of the large insurance companies and had been advised that a fund of approximately $10,000,000 would be necessary to accomplish what management had in contemplation.
The following resolution was thereupon adopted:
"Following a discussion of a plan to finance the company's pension and/or insurance systems through reserving for that purpose a block of the company's Common Stock as now held by it and at the same time setting up a plan for building from company earnings a reserve *Page 380 
to equal the company's investment in such stock by making an annual appropriation to such reserves in the approximate amount of one-quarter of the participation fund for each year, etc."
At a meeting of the board of directors held on January 1st, 1934, the following resolution was adopted:
"Upon motion duly made and seconded, the following resolution was unanimously adopted:
"Whereas the Company has heretofore announced and put into operation, under the limitations and conditions therein set forth, a plan providing for the payment of retirement benefits to employees who have attained certain ages or who have become incapacitated for further work while in the employ of the Company, which said plan is fully set forth in a bulletin or pamphlet issued by the Company under date of November 27, 1929, reference to which is hereby made; and
"Whereas the Company has likewise announced and put into operation, under the conditions and limitations therein provided, a plan making available to its employees the privileges of Group Life Insurance, Total Permanent Disability Insurance and Accident Health Insurance, and has in connection therewith undertaken to and does pay the excess cost of such insurance over and above that paid by the employees under the terms of the plan, all of which is more fully set forth in the bulletin or pamphlet issued by the Company under date of December 3, 1929, reference to which is hereby made; and
"Whereas the Company hopes to continue in effect, subject to improvements or modifications, the Retirement and Group Insurance Plans hereinbefore referred to, and to that end is desirous of providing, otherwise than through its current operating costs, a source of income wherewith to defray the costs incident to such continuance; and
"Whereas the Company has heretofore acquired at a cost of $10,120,000, and now holds 200,000 shares of its own Common Stock, which said shares are listed among the assets of the Company at the cost thereof:
"RESOLVED: That it is advisable and for the best interest of the Company, effective as of the 31st day of December, 1933, and subject to the limitations hereinafter set forth, that the following plan be, and it hereby is, entered upon as serving the above declared purposes.
"(1) That out of the income from the 200,000 shares of Common Stock of the Company hereinabove described, and as said income is received, there shall first be reserved a sum corresponding to interest sufficient to provide the Company a return upon any balance of its investment in said shares at a rate in line with current returns on short-term U.S. Government securities and the remainder of the income shall be currently set apart for use in defraying the cost to the Company of carrying the aforesaid Retirement and Group Insurance Plans, subject to the limitations therein contained, and the surplus, if any, at the end of each year, shall be applied, along with the *Page 381 
fund hereinafter provided for in paragraph (2) hereof, as a reserve in reduction of the Company's investment in said shares.
"(2) That by way of building a reserve in reduction of the investment of the Company in said 200,000 shares of Common Stock, there shall be set up on the books of the Company at the end of each year, beginning with the year 1934, an item to be carried to reserve in reduction of the Company's investment in said shares of stock, the amount of which item is to be arrived at as follows:
"When the amount, if any, of the Company's profits for the year which might be distributed as participation under Article 12 of the By-Laws is determined, this amount shall be divided by a figure representing the total number of shares of Common Stock qualified under said By-Law for participation for that year plus the number of shares of said stock held for the purposes stated in this resolution. The quotient so arrived at shall be multiplied by the number of shares of Common Stock held for the purposes of this resolution and the amount so arrived at shall be accepted as the sum to be set aside from Company profits for the year and credited to the reserve in reduction of the company's investment in the shares herein referred to.
"(3) After the reserve fund herein provided for shall have reached an amount equaling the Company's investment in said shares, the Directors shall continue to make each year an appropriation, in amount and in manner as provided for in paragraph (2) above, to be used as a supplement to the income of the Investment Fund for purposes of meeting the expenses of the Company's insurance and pension systems and/or as an addition to said Investment Fund.
"(4) When in any year any amount shall have been set aside under paragraphs (2) and/or (3) hereof, the Directors, in declaring the participation for said year, shall not declare same in an amount which when added to the amount so set aside shall result in a total in excess of that part of the Company's annual profits for the year which might be distributed as participation under Article 12 of the By-Laws.
"RESOLVED FURTHER that the Company reserves the right at any time to change, modify, revoke or renounce, in whole or in part, the policy and plan herein adopted, and that nothing herein contained shall be construed as giving to any employee, or to any other person, any vested right or any benefits under any of the plans or any interest in or to the shares of stock hereinabove described."
The complainants have charged that the board of directors did not know of the operations of the Reynolds Special Accounts by Messrs. W.N. Reynolds and James A. Gray; that there was no resolution of the board authorizing the large purchases of common stock, and B stock for exchange for common stock for sale to employees on the cost, plus interest, less dividends plan that had been in operation since 1920, and that these were not in fact company transactions. *Page 382 
These resolutions answer these contentions. The evidence is that every director knew of it, and consulted from time to time with the heads of departments under him as to whom stock available for distribution should be allotted.
The absence of express advance approval by the directors is not necessary.
In Bank of United States v. Dandridge, 12 Wheat. 64, Mr. Justice Story, among other things, said:
"In reason and justice, there does not seem any solid ground why a corporation may not, in case of the omission of its officers to preserve a written record, give such proofs to support its rights as would be admissible in suits against it to support adverse rights."
At p. 83, he further said:
"In what respects do the acts of a board of agents differ from those of a single agent, in their operation as evidence? A board may accept a contract, or approve a security by vote, or by a tacit and implied assent. The vote or assent may be more difficult of proof by parol evidence, than if it were reduced to writing. But, surely, this is not a sufficient reason for declaring that the vote or assent is inoperative. If a board of directors agree to build a banking-house, and it is accordingly built, and paid for by their cashier, with their assent, is the whole proceeding to be deemed void, because, in the progress of the undertaking, from accident or negligence, the votes and the payments have not been verified by regular minutes?"
At p. 88, he further said:
"But the very point in controversy is, whether such written record be necessary by the charter or by-laws, not as a matter of convenience or discreet exercise of authority, but as a sine quanon to the validity of the act. The cases which have been commented on by the court do not deny the distinction, but proceed upon the ground that, unless positively required by law, a written vote is not to be deemed indispensable. The court, then, is called upon, not to administer a doctrine of strict, and settled, and technical law, but to introduce a new rule into the law of evidence; and to exclude presumptive evidence, not only of the acts of corporations, but of their *Page 383 
unincorporated agents. If such a rule be fit to be adopted, it must be upon the foundation of some clear and unequivocal analogy of law, and public policy and convenience. We are not prepared to admit that it has any such foundation."
The above opinion was cited by the Court of Errors and Appeals in Bennett v. Millville Improvement Co., 67 N.J. Law 320;51 Atl. Rep. 706.
The result of the operation of the Retirement and Insurance Investment Fund is that over $5,000,000 which otherwise would have been paid as participation to officers and employees has been retained in the company's treasury and set up to reduce the cost of the 200,000 shares of common stock constituting the fund. Thus $5,000,000 plus the regular dividends on the stock less the expenses of the plans and interest on the unamortized cost to the company of the stock had reduced the cost of the stock on the books of the company to $2,716,586.54 from $10,120,000 by December 31st, 1942.
Complainants' counsel criticize the plan and allege some errors detected by their accountants in the bookkeeping of the items of charge, but Mr. Gray testified, and the records show that company accountants caught these errors and corrected them by charging the amounts of the errors and against undistributed participation. He said that at the end of 1942, after the correction of these errors, there was still payable to participating stockholders participation for prior years aggregating over $233,000.
I feel that the defendants should not be charged with liability because of the way in which expenses of the Retirement and Group Insurance Fund were handled on the books of the company, since the company sustained no loss and neither the directors nor the employees holding common stock secured any gain.
While the complainants contend that the shares placed in the Insurance and Retirement Fund were not worth $50 a share or any such sum, and that such a number of shares could not have been sold to employees by the company, defendants proved that after January 1st, 1934, and until the beginning of this suit the common stock did not sell at any time for as low as $50 a share, and, on the contrary, they proved *Page 384 
the distribution to employees of a number of large blocks of common stock including that of Bowman Gray, deceased, which block sold as high as over $60 per share and was oversubscribed by employees. It is also the evidence that the common stock before this suit was brought never sold less than 1 1/4 times the price of the B stock, due solely to the participating right.
 THE FAILURE OF THE COMPANY TO DEDUCT PARTICIPATION PAYMENTS AS A BUSINESS EXPENSE IN ITS INCOME TAX RETURNS.
The complainants charge that the individual defendants are liable for the loss sustained by the company by reason of the failure to deduct the participation payments made pursuant to article XII of the by-laws as an operating expense in the corporation's income tax returns. Complainants contend that payments made under this by-law were deductible under the Internal Revenue Law as expenses of the company. They charge the personal interest of the defendant directors and officers conflicted with their duty to cause said payments to be deducted from the company's taxable income; and the failure to take such deductions was a breach of duty for which they argue, the defendants are liable.
The defendants challenge the complainants' contention, and claim the participation payments made pursuant to article XII were not deductible from the taxable income of the company for tax purposes. They assert that the amounts payable under the by-law had three characteristics: (1) they were payable only out of profits; (2) they were payable only as an extra dividend on stock owned by an employee; and (3) in proportion to the stock owned. They had the nature of a return upon an investment. As hereinabove observed the design of the by-law was to furnish an incentive to all employees who held common stock, and in the case of the more important officers the payments made it possible for the company to secure and retain their services upon the payment of modest salaries. *Page 385 
As hereinabove stated these payments were not deducted from the taxable income of the company because the federal regulations prohibited such a deduction. Mr. Williams, in his testimony, referred to Regulation 33, which was printed in the Corporation Trust Company Tax Service as article 119, and reads as follows:
"Amounts paid as compensation or additional compensation to officers or employees, which amounts are based upon the stock holdings of such officers or employees, are held to be dividends, and although paid in lieu of salaries or wages are not allowable deductions from gross income for the reason that dividends are not deductible."
He produced an official print of Regulation No. 33 Revised, which was used by the company and by him as a member of its legal department at a later period. He read from the official text at page 73 as follows:
"Special payments made to officers or employees who are stockholders in the guise of additional salaries or compensation the amount of which is based upon or bears a close relationship to the stock holdings of such officers or employees or the capital invested by them in the business of the company, will be regarded as a special distribution of profits or compensation for the capital invested and not payment for services rendered. Payments under such latter conditions being in the nature of dividends will not be deductible from gross income."
He stated that on one occasion in or about 1920 he discussed this matter with A.D. Watts, who was the Collector of Internal Revenue in the District of North Carolina and handled the income tax returns of the company, and was advised by Watts that the payments could not be deducted. He further testified that last year he took up the question with the Internal Revenue Department at Washington. The purpose of taking up the matter at that time was that he wanted an official ruling as to whether the Treasury Department in applying the Salary Stabilization Regulation and administering the Salary Stabilization Act would regard the amounts payable under the by-law as dividends or as compensation. If they were regarded as compensation they would have been subject to the limitations of the Salary Stabilization Act. If they were regarded as dividends, they would not be so subject. *Page 386 
He produced the letter written by him to the Commissioner of Internal Revenue under date of December 18th, 1942. In the letter he referred to the fact that the Bureau had held throughout the period of federal income taxes that the disbursements made under the by-law were dividends and that the company had not been permitted to deduct such disbursements as expense items in arriving at taxable income. He referred to a copy of the by-law which was in the possession of the Commissioner, described the stock of the company, stated the salaries and participations received by some of the directors, and asked for advice with reference to the Salary Stabilization Law.
The reply to this letter, which was signed by Guy T. Helvering, Commissioner, under date of December 31st, 1942, in part, reads:
"The special dividends paid or to be paid on the Common Stock of your Company, to your employees who own stock in your Company, as described in your letter, and as provided in your by-laws, are preferential dividends, and not bonuses or additional compensation within the meaning of the general regulations and the Salary Stabilization Regulations, copies of which are enclosed."
Under the regulations of the Bureau of Internal Revenue, and the decisions of the courts, the by-law payments were not properly deductible as compensation paid by the company to officers and employees. The Treasury Regulation, among other things, declares as follows: "The test of deducibility in the case of compensation payments is whether they are reasonable, and are in fact payments purely for services."
The payments made under the by-law in question appear to be reasonable but they were not payments purely for services. As above stated, they were in part a return on an investment in stock of the company. Because the common stock when owned by a qualified employee carried this extra right to participation, it sold, it is asserted, at a very much higher price than the B stock which paid the same regular dividend. As heretofore observed the investment in the common stock was necessary in order to secure any participation. The participation when distributed was required to be distributed *Page 387 
in direct proportion to the number of shares owned. The directors had discretion as to the amount of shares owned. The directors had discretion as to the amount of profits which would be distributed to the employee stockholders within the limits fixed by the by-law, but they had no discretion as to the persons to whom such distributions should be made or as to the apportionment of the distribution so long as the owners of the stock had been employed for a year and continued in the employ of the company.
The complainants charge that the failure of the directors to protect the corporation from overpayment of taxes constituted waste and a breach of duty, for which the defendants are accountable; to which the defendants reply that the directors conscientiously and scrupulously discharged their duty to the corporation. I do not find they were guilty of waste or breach of duty. I believe the directors took every reasonable precaution to protect and conserve the interests of the company.
 THE A.A.A. TAX REFUND IN 1941.
The complainants further say the defendants improperly included the A.A.A. processing tax refund in the corporation's 1941 income upon which bonuses were paid. By reason of the processing tax refund the corporation received $1,950,323.96. The board of directors by resolution included this sum in the computation of bonusable income under article XII as an annual profit for the year 1941. The recovery aforesaid appears to have been arrived at as follows: The principal sum of the refund settlement was $2,100,000. The interest amounted to $868,099.18, which made a total gross refund of $2,968,099.18; there was deducted therefrom the income tax thereon at the 1941 rate amounting to $1,017,775.22, leaving a net recovery of $1,950,323.96.
The complainants contend that the refund could be income applicable only to the years 1933-1935, and could not be income for the year 1941; and that the payment of 1941 bonus thereon was improper because paid to a different and wrong class of officers-employees in violation of the by-law; *Page 388 
and that the 1933-1935 class of officers-employees were likewise not entitled to receive such participation.
It appears that the company paid processing taxes under the Agricultural Adjustment Act in 1933, 1934 and 1935 amounting to approximately $13,000,000. The United States Supreme Court decided the law under which these taxes were collected was unconstitutional. United States v. Butler, 297 U.S. 1
(decided January 6th, 1936). The corporation filed a claim for the return of the A.A.A. taxes. The defendants say a measure was introduced in Congress covering the refund of such taxes, which was so drawn as to limit recoveries as closely as they could be limited. See Revenue Act of 1936 Title VII, U.S.C.A. 26, pp.960-970 §§ 902 to 917.
Defendants further say, toward the end of the year 1941 a settlement of the claim was effected "on basis that the item received would be handled by us as 1941 income, a requirement of those in the Bureau of Internal Revenue who made me the offer of settlement and made the settlement with me." (Quotation from testimony of Mr. S. Clay Williams.) The settlement was made shortly after December 7th, 1941, when as testified by Mr. Williams: "Every prospect, as I read them at the time, was for higher or at least a threat of very much higher corporate taxes in the year 1942 than were applicable to the year 1941." Mr. Williams further declared that never, in the conferences which he held with the government representatives, "did they ever make me an offer of a certain amount of money that they would pay me on any basis other than that I account for it as income for the year 1941 and pay on it the high rate for 1941 as against the lower rates of 1933, 1934 and 1935, when the money went out from the company treasury in the form of processing taxes."
The defendants say that with an attack pending in court as to the constitutionality of the Agricultural Adjustment Act, the Internal Revenue Bureau kept open defendant's corporation income tax returns for 1933, 1934 and 1935 because the company had taken a deduction for the $13,000,000 of processing taxes paid in those years. The Internal Revenue agent in charge at Greensboro, North Carolina, who had the authority to make the final adjustments and settlement, and close the *Page 389 
returns with the company for 1933 to 1935, took the position, defendants say, that he was not going to close with the company for those years, in the face of the fact that the Supreme Court had determined that $13,000,000 had been illegally collected from the company, without securing an agreement from the company that it would pay taxes on any part of the $13,000,000 recovered in the year in which such recovery was had at the rates then in effect.
Mr. Williams produced a letter from the Internal Revenue agent in charge at Greensboro, dated February 7th, 1940, which was as follows:
"The determination of your income tax liability for the years indicated (1933, 1934 and 1935) has been held in abeyance awaiting final action on your claim for refund filed under the provisions of Title VII of the Revenue Act of 1936. In order to effect a closing of your income tax returns for the taxable years indicated, this office proposes to allow the processing taxes paid and claimed for deductions for such years on condition that you sign and return the originals of the attached agreements."
The agreements mentioned in this letter read as follows:
"In consideration of the allowance by the Commissioner of Internal Revenue as a deduction from gross income or as cost of goods sold for income tax purposes under Title I of the appropriate revenue acts, for the taxable year ended December 31, 1933, of the amounts disallowed as deductions or proposed to be disallowed as deductions for the reason that claims were filed under Title VII of the Revenue Act of 1936, the undersigned taxpayer agrees to include in gross income in income tax returns under existing income and profits tax acts or corresponding provisions of future income and profits tax acts, for the year or years received or accrued, depending upon the method of accounting employed, any and all amounts paid as taxes under the provisions of the Agricultural Adjustment Act subsequently refunded or credited."
These agreements, defendants say, were signed, and the tax returns of the company for 1933, 1934 and 1935 were closed in accordance therewith.
The reason for this disposition of the matter, defendants assert, was that the revenue agent proposed to make an additional assessment against the corporation for the years 1933, 1934 and 1935, disallowing the deduction claimed in those *Page 390 
years, aggregating $13,000,000 for processing taxes paid, and require the company to pay taxes for such years on an additional $13,000,000 of income.
The claim for refund of the A.A.A. processing taxes was finally settled during the latter part of December, 1941, the board of directors of the company, on December 22d 1941, authorizing the settlement that Mr. Williams had negotiated.
The company's financial statement for the year 1941 was sent to the stockholders with a letter dated January 15th, 1942, which called attention to the settlement. The statement showed at that time that the amount of the settlement was added to the undivided profits for the year 1941.
While the complainants contend that this income was not taxable income for the year 1941, with citations in support of that contention, the decisions, however, do not relate to this phase since the company, as above stated, was required to agree to include this refund in its income for 1941, since the government exacted this agreement, and the company, in order to secure the refund was obliged to make it. It is defendants' contention that this settlement was at a disadvantage to directors. The latter would have received more if distributed as desired by complainants. They owned 35.51% of participating stock in 1941 whereas in 1933 they owned 51.68%.
Complainants' contention that notwithstanding the fact that under the arrangement with the government the refund was required to be considered as income for the year 1941, it was not, in fact, income for that year, and therefore could not be lawfully distributed as a part of the participation under the by-law for that year, should, in my opinion, carry no weight. The defendants' course, in the circumstances, I believe was justified and merits approval. Mann v. Luke, 44 N.Y. Supp. 2d 202,211.
 SALARIES OF OFFICERS.
The complainants say the increases in salaries paid to officers and directors in 1934 and subsequent years, were unauthorized and therefore unlawful. *Page 391 
The defendants assert that the executive committee had authorized the increases. They point to the resolution adopted by the board on December 31st, 1934, which reads as follows:
"Whereas, upon the question of what action the Directors shall take under By-Law XII with reference to participation by officers and employees in the profits for 1934 as provided in said By-Law, a complete list of all persons in Company employ and holding Common Stock of the Company throughout said year, as specified in said By-Law, (which list shows for each person the name, the salary for 1934 and the number of shares of the Company's Common Stock held throughout the year 1934), has been produced, exhibited and read before the Directors in this meeting assembled, with the result that each of them has, through the reading and study of such list, been fully informed as to the employment, the salary for 1934 and the number of shares of Common Stock of the Company held throughout 1934 by each officer and employee whose name appears upon said list as eligible under said By-Law for the year 1934; and
"Whereas, the Directors have, in accordance with the authority and discretion vested in them under the said By-Law XII and otherwise, found and do hereby find and declare that a distribution of a participating dividend, in accordance with said By-Law, among the persons on said list, in a sum equal to 10% of the Company's profits for 1934 in excess of 22.19% on the entire outstanding issue of $10,000,000 of Common Stock, after deducting from the sum thus arrived at the amount set aside pursuant to paragraph 2 of the said resolution adopted by the Board of Directors on the 1st day of January, 1934 (which distribution to the persons on said list would amount to $2.50 per share on the 651,703 shares eligible for participation for said year), would not, in the opinion and in the finding of the Board of Directors, effect and amount to a payment in excess of a reasonable and proper compensation, in addition to salary, to each of said officers and employees for the year 1934."
Similar resolutions were adopted in the subsequent years, and also prior thereto, which resolutions, they argue, were ratifications by the board of directors of the salaries paid. The defendants find support for the salaries in the decision inGardner v. Butler, 30 N.J. Eq. 702, wherein Mr. Justice Van Syckel, speaking for the Court of Errors and Appeals, said:
"But while the express undertaking is without legal force, the directors of a company have a right to serve it in the capacity of officers, agents or employees, and for such services the law will enable them to recover a just and reasonable compensation.
 * * * * * * * *Page 392 
"The case resolves itself, then, into this question: Have the directors, whose action is the subject of controversy, retained for their services more than they are justly and reasonably entitled to? The burden is on them to show what they reasonably deserve to have, and no unjust exaction will be permitted.
"The objection to the salary of the president is not pressed, and all the witnesses of experience concur in saying that the commission charged was moderate and within the customary rates. The sums claimed by the defendants appear to have been fairly earned, and may therefore be retained by them."
The largest salary the company ever paid to any officer was $100,000 per year. The greatest amount that was ever paid to any officer or director was $507,999.96 paid to Bowman Gray in 1931, and this included his annual salary of $33,999.96 and the remainder was participation on the common stock in which he had made a heavy investment.
The financial condition of the company at December 31st, 1912, shows that its issued capital stock was $10,000,000, its undivided profits were $5,844,572.95 and total resources $17,659,963.93. After 30 years of operation of this by-law the condition of the company is shown in the December 31st, 1942, statement to be:
Common Stock issued and outstanding ................. $10,000,000.00
New Class B Common Stock outstanding ................ 90,000,000.00
Undivided Profits ................................... 55,331,442.13

And, as above stated, the only contribution ever made by stockholders to this capital was $20,000,000.
Defendants' witness, Paul B. Coffman, vice-president of Standard Poors Corporation, testified for them and produced a series of analyses and charts that he made from a study of the earnings of the R.J. Reynolds Tobacco Company as against that of 131 representative American corporations for the twenty-year period 1922 to 1941. The average of Reynolds was 13.83% and of the 131 companies the average was 9.53%. Mr. Coffman selected from the above mentioned list 35 American corporations listed on the Stock Exchange with the highest average per cent. earned on invested capital. *Page 393 
The average earnings of these was 13.95%. The average earnings of the 131 companies was 7.44%. The average earnings of Reynolds was 18.64% against the per cent. earned on invested capital for the twenty-year period; American Tobacco Company 11.78%; Liggett 
Myers Tobacco Company 12.95%; P. Lorillard Co. not stated.
Over the twelve-year period 1930 to 1941, 99 companies were selected with the highest per cent. earned on invested capital. The average of the 99 was 8.63%. The average of the 25 companies with the highest average earned on invested capital was 15.73%, while the Reynolds average in the twelve-year period was 17.21%.
Mr. Coffman also made a chart showing an investment of approximately $10,000 in January, 1913, in the stock of American Tobacco Company, Liggett Myers Tobacco Company and Reynolds Tobacco Company at their then prices. This chart shows that on that investment the stockholder would have received in cash income from sale of rights, cash dividends and value of investment at December 30th, 1942, the following:
From the American investment ........................... $56,161.00
From the Liggett Myers investment .................... 47,977.00
From the Reynolds investment ........................... 150,000.00

Another chart shows that the Reynolds Tobacco Company paid a higher percentage on its stockholder equity from 1912 to 1941 than any other of the four Tobacco Companies mentioned herein, and that Reynolds' percentage of earnings paid to officers and directors, as compared with the four other Tobacco Companies was as follows:
 Liggett Myers .............. 2.98%
 Reynolds ..................... 4.51%
 American ..................... 5.55%
 Lorillard .................... 6.91%

In view of this showing I cannot find that the salaries of the officers and directors were not fair and reasonable. The company's officers and directors by their application to the company's business have made it a successful and marvelous enterprise. *Page 394 
 AS TO TRANSACTIONS BEFORE COMPLAINANTS BECAME STOCKHOLDERS.
The complainants and intervenors maintain they are entitled to obtain recovery for the company as to transactions occurring prior to the acquisition of their stock, as well as subsequent thereto, and to sustain their contention they cite a number of cases, among which are the following: Brown v. Vandyke, 8 N.J. Eq. 795; Gifford v. New Jersey Railroad, c., Co., 10 N.J. Eq. 171; Elkins v. Camden and Atlantic Railroad Co., 36 N.J. Eq. 5;Ellerman v. The Chicago Junction, c., Co., 49 N.J. Eq. 217;23 Atl. Rep. 287; Willoughby v. Chicago Junction, c., Co.,50 N.J. Eq. 656; 25 Atl. Rep. 277; Wilson v. American Palace CarCo., 64 N.J. Eq. 534; 54 Atl. Rep. 415; Appleton v. AmericanMalting Co., 65 N.J. Eq. 375; 54 Atl. Rep. 454; Groel v. UnitedElectric Company of New Jersey, 70 N.J. Eq. 616;61 Atl. Rep. 1061; Goodbody v. Delaney, 80 N.J. Eq. 417; 83 Atl. Rep. 988;Hitchcock v. American Pipe, c., Co., 89 N.J. Eq. 440;105 Atl. Rep. 655; reversed, 90 N.J. Eq. 576; 107 Atl. Rep. 267; Toothe
v. Dozier, 96 N.J. Eq. 46; 124 Atl. Rep. 319; reversed, 96 N.J. Eq. 601; 126 Atl. Rep. 316; Mayer v. Oxidation Products Co.,Inc., 110 N.J. Eq. 141; 159 Atl. Rep. 377; Holub v. Jacobwitz,123 N.J. Eq. 308; 197 Atl. Rep. 423; affirmed, 123 N.J. Eq. 162;197 Atl. Rep. 426; Solimine v. Hollander, 129 N.J. Eq. 264;19 Atl. Rep. 2d 344; Hollander v. Breeze Corporations, Inc.,131 N.J. Eq. 585; 26 Atl. Rep. 2d 507; affirmed, 131 N.J. Eq. 613; 26 Atl. Rep. 2d 522; Slutzker v. Rieber,132 N.J. Eq. 406; 28 Atl. Rep. 2d 525.
I do not interpret the cited cases in the same manner and obtain the conclusion which the complainants and intervenors assertedly reach.
As hereinbefore stated the complainants, Arthur Bookman and Judith W. Bookman, do not claim to have owned any stock in the R.J. Reynolds Tobacco Company prior to July, 1935. The intervenor, Lawrence Robert Lavy, claims to have become a stockholder in August, 1940. The intervenor, Mary *Page 395 
B. Healey, claims to have bought five shares of stock in January, 1927, and makes no claim to having been a stockholder prior to that date. She now claims to be the owner of 38 shares, while Lavy claims to own 45 shares. The original complainants each claim to own 100 shares, so that the complainants and intervenors together claim to own 283 shares out of 10,000,000 shares outstanding. They seek to question transactions which were completed long before they acquired their stock.
I do not agree with their counsel that the rule is well settled in this state that in a derivative stockholders action, the fact that stock has been acquired by complainants subsequent to the acts complained of, is no barrier as to their maintenance of the suit as to such acts, and their citations last aforesaid, do not support their statement that the decisions of the courts of this state uphold their view.
While complainants cited cases describing the character of a derivative suit, none of those cases consider the question here involved as to whether the principles announced in Hawes v.Oakland, 104 U.S. 450, precluded a stockholder from representing the corporation in a suit instituted with respect to transactions which were completed before he acquired his stock. This question has not been determined in this state, and in my opinion was not involved in any of the cases before cited. The federal courts adhere most closely to the rule announced inHawes v. Oakland, supra, and other jurisdictions follow the principle therein enunciated.
In Gallup v. Caldwell, 120 Fed. Rep. 2d 90, cited by complainants, a stockholders' suit was instituted in the United States District Court for the District of Delaware. The corporation was a New Jersey corporation. The question whether the stockholder could complain of acts which had been completed before she became a shareholder was raised by motion. In behalf of the complainant it was contended that under the decision ofErie Railroad v. Tompkins, 304 U.S. 64, the federal courts would be required to follow the state law if the state law differed from the rule of the federal courts on this question. The District Court had dismissed the complaint because it did not appear that the complainant was a *Page 396 
stockholder of record. The Circuit Court of Appeals reversed the action of the District Court, holding that the plaintiff had established that she was the equitable owner of stock, but held that she would be confined to a transaction which occurred after she became the equitable owner of the stock. The court held that since the corporation was a New Jersey corporation the right of a stockholder to sue in its behalf would be governed by New Jersey law if under Erie Railroad v. Tompkins, the federal court was obliged to follow the rule established by the state courts; that the case of Appleton v. American Malting Co., 65 N.J. Eq. 375;54 Atl. Rep. 454, did not establish that in New Jersey a stockholder may institute a derivative suit with respect to transactions completed before he became a stockholder, and that this rule had not been established by Elkins v. Camden andAtlantic Railroad Co., 36 N.J. Eq. 5; Hodge v. United StatesSteel Corp., 64 N.J. Eq. 111; 53 Atl. Rep. 553, or GeneralInvestment Co. v. Bethlehem Steel Corp., 87 N.J. Eq. 234;100 Atl. Rep. 347. After citing these cases Judge Goodrich said:
"The conclusion is that the point is not a settled one under the law of New Jersey. Under such circumstances the proper course seems to be to follow the rule laid down in rule 23 (b). The discussion of this rule in Moore's Federal Practice indicates some considerable basis for argument that the rule is substantive in character. If it is, Moore states, `It is subject to challenge in the federal courts in those states which have no such requirements * * *.' Moore's Federal Practice 2250 et seq. On this interesting point we express no opinion one way or the other. Until the state law is found to be in conflict it seems clearly the duty of a lower federal court to follow the rules which the Supreme Court has promulgated for its guidance.
"We conclude, therefore, that the plaintiff may complain only of acts occurring subsequent to her becoming the owner of shares in the defendant company."
In the very recent case of Mathews v. The American TobaccoCo., 135 N.J. Eq. 11; 37 Atl. Rep. 2d 99, the Court of Errors and Appeals affirmed the decision of this court dismissing a petition of certain stockholders to set aside an *Page 397 
order dismissing a stockholders' suit. The opinion of the Court of Errors and Appeals is brief. The second paragraph of it reads as follows:
"The petition to vacate the consent dismissal of those actions was filed January 30th, 1940. It does not appear when the petitioners acquired their stock interests, whether before or after the event of which they complained. Taylor v. Holmes,127 U.S. 489."
In Taylor v. Holmes, 127 U.S. 489, cited by our Court of Errors and Appeals in Mathews v. The American Tobacco Co.,supra, the opinion of Mr. Justice Miller, in part, reads:
"Although there is in the bill a declaration that the two complainants are owners of a majority of the stock of the Gold Hill Mining Company, there is no statement as to when or how they became such, or whether they were such stockholders during the times that injuries were inflicted, of which they now complain, in regard to the taking possession of the property by the defendants, or whether they became stockholders afterwards. In short, there is no such averment of their relation to the corporation, or of their interest in the matter about which they now seek relief, as brings this action within the principle of the decisions of this court upon the subject. Hawes v.Oakland, 104 U.S. 450."
As stated in the brief of complainants' counsel, Hawes v.Oakland, 104 U.S. 450, is the case upon which is based the federal practice which prohibits a stockholder from bringing a derivative suit with respect to transactions which were consummated before he acquired his stock. In Hawes v. Oakland,supra, the court enumerated the cases in which a stockholder may maintain a derivative suit in his own name. At p. 461, the court stated that the complaint must contain "an allegation that complainant was a shareholder at the time of the transactions of which he complains, or that his shares have devolved on him since by operation of law, * * *." It will be seen, therefore, that one of the reasons assigned by the Court of Errors and Appeals in affirming the judgment in Mathews v. The American Tobacco Co.,supra, was that it did not appear that the petitioners were stockholders at the time of the event of which they complained. This appears *Page 398 
not only from the language of the opinion but from the citation of Taylor v. Holmes, supra, which in turn cites Hawes v.Oakland, supra.
The rule is well established in the federal courts that a stockholder may not institute a derivative suit with respect to transactions which were consummated before he acquired his stock unless his stock devolved upon him by operation of law. HomeFire Insurance Co. v. Barber (Sup. Ct., Neb., 1903),93 N.W. Rep. 1024, is a leading case on this subject in a state court. The opinion in the cause was written by Dean Pound, sitting as Commissioner. Speaking of the federal rule, Dean Pound said, in part (at p. 1029):
"The rule has its foundation in a sound and wholesome principle of equity, namely, that the rules worked out by chancellors in furtherance of right and justice shall not be used, because of their technical character, as rules to reach inequitable or unjust results. Resting on this basis, `the value and importance of the rule * * * are constantly manifested.' Field, J., inDimpfel v. Ohio M.R. Co., 110 U.S. 209; 3 Sup. Ct. 573;28 L.Ed. 121. The right of the stockholder to sue exists because of special injury to him for which otherwise he is without redress. If this interest is trifling, and the injury thereto of no consequence, he cannot sue to compel righting of wrongs to the corporation. McHenry v. New York, P. O.R. Co. (C.C.),22 Fed. Rep. 130; Albers v. Merchants' Exchange, 45 Mo. App. 206.
Hence there is obvious reason for holding that one who held no stock at the time of the mismanagement ought not to be allowed to sue, unless the mismanagement or its effects continue and are injurious to him, or it affects him specially and peculiarly in some other manner. City of Chicago v. Cameron, 22 Ill. App. 91,
on appeal, 120 Ill. 447; 11 N.E. Rep. 899, is a case of the first type. Carson v. Iowa City Gaslight Co., 80 Iowa 638;45 N.W. Rep. 1068, is of the second type. Except in such cases the purchaser ought to take things as he found them when he voluntarily acquired an interest. If he was defrauded in the purchase, he should sue the vendor. As to the corporation and its managers, so long as he is not injured in what he got when he purchased, and holds exactly what *Page 399 
he got and in the condition in which he got it, there is no ground of complaint. Clark v. American Coal Co., 86 Iowa 436;53 N.W. Rep. 291; 17 L.R.A. 557."
In Coane v. American Distilling Co., 49 N.Y.S. 2d 838
(Sup.Ct., Special Term, New York County, 1944), Mr. Justice Eder held that the statute recently enacted by the legislature in New York which provides that a stockholder in a derivative action may not question transactions which occurred prior to the time when he acquired his stock, was a valid act and applicable to cases which were pending at the time the statute was enacted. The court quoted from the memorandum of the Governor, in signing the bill, as follows:
"In recent years a veritable racket of baseless law suits accompanied by many unethical practices has grown up in this field. Worse, yet, many suits that were well based have been brought, not in the interest of the corporation or of its stockholders, but in order to obtain money for particular individuals who had no interest in the corporation or in its stockholders. Secret settlements — really pay-offs for silence — have been the subjects of common suspicion."
The court further said (at p. 843):
"It is thus seen that the legislature was seeking to eradicate an evil then current with respect to that particular type of litigation and that it sought to remedy that condition by curtailing and limiting the legal capacity to sue to one who was a stockholder at the time of the transaction of which he complained. This imposition thus curbed in large measure a fruitful source of unwarranted and unscrupulously conceived litigation, but while it did so it did not abolish the shareholder's theretofore existing right of action nor did it destroy the remedy for its enforcement; such right and remedy still remain and may be as fully and effectively invoked and enforced, as heretofore, by those qualified to meet the new standard as now set by section 61, as amended. No vested or substantive right has been taken away or destroyed; the qualified stockholder is free to proceed as before and may intervene in and continue any pending action (Rule 24, F.R.C.P.; Malcolm v.Cities Service Co., D.C., 2 F.R.D. 405; section 193, subd. 3,C.P.A.; Maas v. Sullivan, 124 *Page 400 Misc. 295; 207 N.Y.S. 181; affirmed, 213 App. Div. 820;208 N YS. 895); only the litigious corporate carrion are hampered and have been isolated."
On April 10th, 1945, our legislature enacted chapter 131, P.L.1945, which is apparently patterned after the New York statute above mentioned and among other things provides:
"2. In any action, suit or proceeding brought or maintained in the right of a domestic or foreign corporation by the holder or holders of shares, or of voting trust certificates representing shares, of such corporation, it must be made to appear that the complainant was a shareholder or the holder of a voting trust certificate at the time of the transaction of which he complains or that his share or voting trust certificate thereafter devolved upon him by operation of law.
3. This act shall take effect immediately and shall apply to all such actions, suits or proceedings now pending in which no final judgment has been entered, and to all future actions, suits and proceedings."
Counsel for complainants have brought this act to the attention of the court and allege it is unconstitutional and that it impairs the obligation of their contract rights. In view of the decisions of the New Jersey courts mentioned herein, I find it to be declaratory of the pre-existing law, valid and binding. In this case, however, the merits as well as the law are with the defendants.
It is the contention of the complainants and intervenors that the right to relief in this suit is not barred by the statute of limitations, laches, estoppel, acquiescence or ratification, for the reason that the defendants are not and have not been residents of New Jersey since the accrual of the causes of action herein asserted.
I have considered the complainant's contentions as to the defense of laches and estoppel herein, and it is not necessary to reiterate them again. Most of the causes of action are based upon transactions which were consummated more than six years prior to the institution of this suit, and the only alleged causes of action which were not so consummated appear to be:
(1) The continuing payments of participations under the by-law;
(2) The calculation of participations on the basis of the common stock outstanding without including the B shares; *Page 401 
(3) The fact that the amounts of participations paid under the by-law were not deducted in calculating the participation;
(4) The fact that the amount paid under the by-law was not deducted from the income of the corporation in determining its taxable income;
(5) The inclusion in profits for the year 1941 of the refund of taxes paid under the A.A.A. Processing Tax Act.
As to all of the above, except number 5, the practice was adopted more than six years before the suit was instituted aad continued to the present time.
Only two of the defendants were directors of the company at the time some of these transactions complained of occurred. Many officers and directors of the company who participated in these transactions as herein above mentioned, died prior to the institution of this suit.
The complainants say the statute of limitations has no application to the case at bar, but I do not accept that statement as indicating the policy of our courts of equity. Our courts of equity have taken the attitude that they are bound by the principles of the statute of limitations, except in matters of strict trust and matters purely equitable in their nature.Colton v. Depew, 60 N.J. Eq. 454; 46 Atl. Rep. 728.
Complainants assert that the directors owe the stockholders the duty of full disclosure, and concealment is a breach of that duty which operates as equitable fraud; and that the statute of limitations, if applicable, could not commence to run until discovery of the wrongful act. I am not convinced that the situation herein warrants the assumption of any such failure on the part of the directors.
The complainant Bookman testified:
"Q. When, for the first time, did you speak to Mr. Karelsen, about this matter? A. Sometime within a year before the complaint which I signed and made.
 * * * * * * *
"Q. Prior to your talking to Mr. Karelsen, had you been informed or did you have any knowledge of any of the matters complained of in this proceeding? A. No, I would say no." *Page 402 
Which testimony indicated no knowledge of the alleged fact upon which the claim is based until Mr. Karelsen supplied him with the information.
As to Mr. Lavy, it appears that he bought his stock in August, 1940, three or four months before complainants' counsel filed their bill. He testified that he found an item in the newspaper several months before he intervened. He states that he retained counsel in April, 1941, which is a few months after the suit was started. He admitted that he had paid his counsel nothing and had made no agreement to pay his counsel for services rendered.
Mrs. Healey, the intervenor, is the owner of 38 shares. She said she consulted her counsel, Mr. Gaffney, in September or October, 1941; that before she consulted him she had no factual knowledge of the matters set out in the complaint, but she said she "had her suspicions." This owner of 38 shares of stock, of a value of about $1,250, retained Mr. Gaffney in January, 1942. Later she retained Mr. McGroddy's firm in New York; a firm in North Carolina; and a former Supreme Court Justice in Kentucky. Mr. McGroddy, one of her counsel, offered to stipulate that counsel's fees are contingent upon success.
Complainants' accountant, Bernard J. Reis, testified that 3,000 man days had been spent by his ten or fifteen men in examining the books of the corporation. In addition he testified that he had spent over 300 days to the date he was cross-examined early in the trial. The traveling expenses and hotel bills of his staff were paid by Karelsen, Karelsen Rubin, counsel for the Bookmans. No proof was offered that complainants had reimbursed their counsel or had undertaken to do so. Reis admitted that he would not be paid if complainants do not win. He also testified that his accounting firm, Bernard Reis Company, had assigned a 42% interest in any allowance that might be made to him in the event of complainants' success to another accounting firm, Gray, Scheiber Company, some of whose men worked on the case. Reis testified as follows:
"A. I will tell you the story. And he [Karelsen] told me that his client wanted to bring suit against the company and *Page 403 
he asked me whether I would undertake the accounting work, and he told me that of course he and his client did not know the amount of work that was involved, but whether I would undertake the job on the basis that if there were a recovery, that I might make application to the court for fair compensation for my services.
"Q. Suppose there were no recovery? A. Then I would receive nothing.
"Q. That is, if there were no recovery, you personally would pay for these three thousand days of work that your assistants had put in and receive no compensation for your own time? A. That is correct."
He further testified:
"A. There is an arrangement between Gray, Scheiber and Company and Bernard Reis and Company that in the event of a recovery, joint petition will be made to the courts for such fees as the court might allow, and whatever those fees amount to would be divided a certain portion to Bernard Reis and Company and a certain portion to Gray, Scheiber and Company. The portion to Gray, Scheiber and Company is, according to my recollection, about 42 per cent., I think it is, or something like that.
"Q. Well, suppose there shouldn't be a recovery. What will Gray, Scheiber and Company get out of it? A. Nothing."
Lavy, the complainant, testified that he paid nothing to his attorneys for services or disbursements, and declares that he had no agreement.
Mrs. Healey testified she had not made any arrangements with her counsel to pay them for their services, and had not paid them a dollar, and had made no agreement to pay them. Her counsel, Mr. McGroddy of the New York bar, declared he was willing to stipulate that "counsel's compensation in this case is contingent upon success."
Mrs. Healey acquired no stock until 1927, when she purchased five shares. The Bookmans acquired no stock until 1935, while Lavy acquired no stock until 1940. It is clear that they have no standing to prosecute this suit in behalf of the corporation if either they or their predecessors in title acquiesced in the transactions complained of. *Page 404 
In Trimble v. American Sugar Refining Co., 61 N.J. Eq. 340;48 Atl. Rep. 912, Vice-Chancellor Pitney said:
"It is to be observed that the complainant is the holder of one seven-hundred and fortieth part of the capital stock of the company, a trifle less than one-seventh of one per cent. of the whole issue; and it does not appear that any other stockholder is dissatisfied with the conduct of the business of the company in respect to the matters complained of by the bill.
"Admitting that the holder of so small a part of the stock is entitled to be heard in this court for the correction of any real grievance he may suffer by the misconduct of the majority, yet I think it is the duty of the court to require that he should show a clear case by distinct affirmative allegations, even if they should necessarily include some of a negative character. In short, he must anticipate and exclude all reasonably probable conditions which may bar his relief.
"With this preliminary observation, I further remark that the bill does not state at what time complainant acquired the one hundred shares of stock which he holds, and it is common knowledge that the stock of this company, and many others of the same class, is daily dealt in on the Exchange. For aught that appears he may have acquired it a very short time before the filing of the bill, from a holder who had acquiesced in everything that the company had done up to that time and in the policy the carrying out of which the complainant seeks to enjoin. That such acquiescence would bar the original holders of the shares now held by the complainant, if he knew of it, is perfectly well settled. It is necessary, on this point, only to refer to the case of Rabe Cross v. Dunlap, 6 Dick. Ch. Rep.40. And it seems to me that where a person holding so small a fraction of the capital stock as the complainant represents here asks to interfere with a particular phase of the management of the corporation, which is presumably satisfactory to all the other stockholders, he ought to show affirmatively that neither he nor his predecessor in title has acquiesced in the policy of which he now complains, for I think he would be bound by the acquiescence of his predecessor in title." *Page 405 
In Hodge v. United States Steel Corp., 64 N.J. Eq. 90;53 Atl. Rep. 601, Vice-Chancellor Emery, speaking of the complainants in that case, said:
"If such previous holders of either the Smith or Curtis shares have assented, then neither Smith nor Curtis is entitled to a preliminary injunction against the execution of the plan assented to, so far as their rights rest on the ownership of these shares." (Citing Trimble v. American Sugar Refining Co., 16Dick Ch. Rep. 340.)
The Hodge Case was reversed by the Court of Errors (64 N.J. Eq. 807; 54 Atl. Rep. 1). The opinion by Mr. Justice Van Syckel, however, contained the following statement:
"The remaining complainants are Hodge, Smith and Curtis.
"Hodge owns one hundred shares, acquired by him before the contract in question was made.
"Smith owns two hundred shares, acquired since that time from a holder who assented to the contract.
"Curtis, so far as appears, owns no stock.
"The Vice-Chancellor properly held that the case must be considered as based wholly upon the rights of Hodge as a shareholder."
In Solimine v. Hollander, 128 N.J. Eq. 228; 16 Atl. Rep.
2d 203, Vice-Chancellor Stein said:
"The present stockholders are, therefore, bound by the acquiescence of their predecessors in title and are estopped from advancing the claim of corporate opportunity."
The Vice-Chancellor cited Wallen v. Duro-Test Corp.
(unreported) and Trimble v. American Sugar Refining Co.,supra, and other cases.
The rule in New Jersey is that a complainant who has acquiesced in the transaction may not bring a derivative suit based thereon.Endicott v. Marvel, 81 N.J. Eq. 378; 87 Atl. Rep. 230;Trimble v. American Sugar Refining Co., supra; Hodge v. U.S.Steel Corp., supra.
The complainants assert that in the defense of laches, the defense must prove that the delay has prejudiced their position. It has been hereinabove stated that the delay aforesaid has prejudiced the position of the defendants. During the *Page 406 
period of delay many of the defendant company's executive officers and directors have died, and that detailed memoranda of many transactions have been destroyed by the company in the normal course of its business, years after they were made, and years before this suit was commenced.
It is obvious that where delay for years has occurred, defense thereof cannot be as fully and accurately presented as though the charge had been promptly made, taking into consideration the difficulty of retaining all of the details of transactions which they have engaged in for many years, after those transactions have been closed.
It is the rule that the defense of laches depends upon the circumstances of each particular case. Where it would be unfair to permit a stale claim to be asserted, the doctrine applies. Where a gross fraud has been perpetrated, the court is hesitant to relieve the wrongdoer on the ground of laches.
I am satisfied there is no such situation in the instant case.
Notwithstanding the contention of the complainants and intervenors that because the individual defendants had never been residents of New Jersey, they should not be permitted to invoke the statute of limitations or the defense of laches, and their quotation of R.S. 2:24-7, I regard as unsound. The complainants are non-residents. The corporate defendant also maintains its executive offices and principal manufacturing plants at Winston-Salem, North Carolina; for several years it had a plant in Jersey City, which was disposed of before this suit was initiated. The wrongs of which the complainants and intervenors allege evidently did not occur in this state.
In Beardsley v. Southmayd, 15 N.J. Law 171; Taberrer v.Brentnall, 18 N.J. Law 262, and Hale v. Lawrence, Howe v.Lawrence, 21 N.J. Law 714, it was established that where the cause of action arose out of this state, and the plaintiffs were non-residents of this state, the exception to the statute of limitations quoted by complainants' counsel (R.S. 2:24-7) does not apply. This has been the settled law in this state for more than a century.
Complainants' counsel claim not only that the statute of limitations does not bar this suit because of non-residence of *Page 407 
the individual defendants, but that the defense of laches fails because of that fact. They cite no decision in support of this claim, and I doubt that any exists. The defense of laches is an equitable defense and is governed by the principles of equity. As was said by Vice-Chancellor Van Fleet in Rabe v. Dunlap,supra:
"This principle which must control the action of a court of equity, in cases where the defense is laches, was laid down by Lord Camden, many years ago, in these words: `Nothing can call forth the activity of a court of equity but conscience, good faith and reasonable diligence. Where these are wanting the court is passive and does nothing. Laches and neglect are always discountenanced, and therefore from the beginning of this jurisdiction there was always a limitation to suits in equity.'"
In the instant case reasonable diligence on the part of the complainants is lacking.
In Humphreys v. Walsh, 248 Fed. Rep. 414, Judge Woolley speaking for the Circuit Court of Appeals, among other things, said:
"The case was argued by both parties as though there was such a statute (of limitations), but its inapplicability was urged by the defendant because of countervailing equitable considerations. As this aspect of the case pertains directly to the law of New Jersey, which, as a federal court, we are anxious not to disturb, we shall confine our decision to the phase of the case arising under the equitable defense of laches as enforced by federal courts in jurisdictions in which there are state statutes of limitations which, by terms or analogy, may be applied to equitable actions."
The case cited is in point. The defendant had never been a resident of New Jersey. The plaintiff claimed that because of his non-residence the statute of limitations was not a defense. The court did not decide whether the statute of limitations was a defense as the action was one to impress a trust upon assets formerly belonging to the debtor but in the possession of his next of kin. The court did determine, however, that it would be inequitable to permit the enforcement of the *Page 408 
claim under the circumstances present in the case and dismissed the bill.
It appears that complainants, and their predecessors in title, had knowledge and means of knowledge of the defendants' alleged wrongs and failed to take action within a reasonable time, and are, therefore, presumed to have acquiesced in the defendants' conduct, and are chargeable with laches. The defense of estoppel by laches and acquiescence, so far as the by-law is concerned, is based upon the adoption of the by-law by the stockholders without a dissenting vote, and the subsequent acquiescence therein on the part of all the stockholders for a period of approximately thirty years.
As to the cause of action based upon the fact that the company did not consider the B stock in calculating the profits distributable under the by-law, the defense of acquiescence and laches is based upon the fact that the amendment which provided that such stock should "not be considered under the company's plan providing for participation by officers and employees, in certain profits of the company" was adopted by the stockholders, has been referred to for many years on the face of every certificate of stock, and no objection has been taken.
So far as the inclusion of dividends on company-owned stock in the calculation of profits distributable under the by-law is concerned the defense of laches and acquiescence is based upon the notices to all stockholders in the president's letters and financial statements above referred to.
The same is also true as to the inclusion of profits upon the sale of company-owned stock in calculating profits under the by-law, and as to the claims based upon the acquisition of the 200,000 shares of common stock and their inclusion in, and the establishment of the Retirement and Insurance Investment Fund.
I do not find in this proceeding that the defendants were guilty of any fraudulent transactions or breach of trust. I believe that the individual defendants discharged their duty as directors, and officers of the corporate defendant with care, integrity, and outstanding ability; that their acts, which are *Page 409 
the object of criticism by the complainants, were undertaken for the sole aim of benefiting the corporation and its stockholders.
The defendants voluntarily appeared in this suit and submitted their course of conduct as officers and employees of the defendant corporation to the scrutiny of the court.
In Wallen v. Duro-Test (unreported), supra, Vice-Chancellor Fielder said:
"Complainant seeks by this suit to establish rights of Duro-Test against the defendants, rather than his individual rights and in such a suit the motives of the complainant are a proper subject of inquiry. (Hodge v. U.S. Steel Co., 64 N.J. Eq. 111.) Considering this complainant's infinitesimal proportionate interest in Duro-Test stock issue, it does not seem that he is moved solely by a desire to benefit other stockholders who decline to join in his attacks on the defendant's acts, but that an ulterior motive has prompted this suit."
The Vice-Chancellor's analysis, reasoning and criticism here quoted most appropriately fit the facts developed in the instant case.
The proportionate interest of the combined complainants in this case is infinitely less than Wallen's interest in his case against Duro-Test.
I shall advise a decree dismissing the bill, with costs. *Page 410